Robert V. Prongay (SBN 270796)
  *rprongay@glancylaw.com*
Charles H. Linehan (SBN 307439)
  *clinehan@glancylaw.com*
Pavithra Rajesh (SBN 323055)
  *prajesh@glancylaw.com*
GLANCY PRONGAY WOLKE & ROTTER LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Plaintiff Trevor Jones*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TREVOR JONES, Individually and on Behalf of All Others Similarly Situated,<br><br>            Plaintiff,<br><br>      v.<br><br>GROCERY OUTLET HOLDING CORP., JASON POTTER, and CHRISTOPHER M. MILLER,<br>            Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

Plaintiff Trevor Jones ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Grocery Outlet Holding Corp. ("Grocery Outlet" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Grocery Outlet; and (c) review of other publicly available information concerning Grocery Outlet.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Grocery Outlet securities between August 5, 2025 and March 4, 2026, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Grocery Outlet Holding Corp. operates as a retailer of consumables and fresh products sold through independently operated stores in the United States. The Company initiated a restructuring plan during the fourth quarter of fiscal 2024, which was purportedly substantially completed in the second quarter of fiscal 2025, intended to improve long-term profitability, cash flow generation and return on invested capital, optimize the footprint of new store growth and lower the Company's cost base (the "Restructuring Plan"). From the second quarter of fiscal 2025 onwards, the Company touted its strong financial and operating performance, driven by rapid new store openings each quarter, supported by the success of the Restructuring Plan.

3.      On March 4, 2026, after the market closed, Grocery Outlet announced results for the fourth quarter and full fiscal year 2025, revealing the Company's full year financial results which missed guidance on nearly every major financial metric. The Company reported full year 2025 adjusted EBITDA of $254.3 million (missing prior guidance of $258 at the low end); net sales of $4.69 billion, (missing prior guidance of $4.70 billion at the low end); comparable store sales which

increased by 0.5% on a 52-week basis (missing prior guidance of 0.6% to 0.9%), and diluted adjusted earnings per share of $0.76 (missing prior guidance of $0.78 at the low end). Moreover, the Company revealed it was adding an additional "optimization plan" on top of its "restructuring plan," and "reshaping [its] new store growth strategy" including the "closure of 36 financially underperforming stores." Further, the Company also "determined that the long-lived assets of the Closure Stores were impaired, and recognized $110 million of non-cash charges in Impairment of long-lived assets on the condensed consolidated statements of operations and comprehensive income (loss)." Finally, the Company stated that it estimates "between $14 million and $25 million in net total restructuring charges in fiscal 2026, including between $51 million and $63 million of estimated cash expenditures primarily for lease termination fees, and between $11 million and $14 million of bad debt expense, partially offset by net non-cash write-off of right-of-use assets and lease liabilities associated with these leases of between $(48) million and $(52) million."

4.     On the same date, the Company held an earnings call in conjunction with releasing fourth quarter 2025 results. During the earnings call, the Company's CEO, Defendant Potter, further revealed that the Company had "made the difficult decision to close 36 locations" in part because "it's clear now that we expanded too quickly, and these closures are a direct correction."

5.     On this news, Grocery Outlet's stock price fell $2.45, or 27.9%, to close at $6.34 per share on March 5, 2026, on unusually heavy trading volume.

6.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) the Company had "expanded too quickly" into new stores; (2) the Company's purportedly strong financial and operational growth was being artificially supported by excessive rapid store expansion; (3) as a result, the Company was unable to achieve the sustainable growth required to meet its previously set guidance; (4) the Company's Restructuring Plan would require further Optimization to achieve

its operational goals, including significant store closures and asset write-downs; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

7. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

11. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

12. Plaintiff Trevor Jones, as set forth in the accompanying certification, incorporated by reference herein, purchased Grocery Outlet securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13. Defendant Grocery Outlet is incorporated under the laws of Delaware with its principal executive offices located in Hayward, California. Grocery Outlet's common stock trades on the NASDAQ stock market under the symbol "GO."

14. Defendant Jason Potter ("Potter") was the Company's Chief Executive Officer ("CEO") at all relevant times.

15. Defendant Christopher M. Miller  ("Miller") was the Company's Chief Financial Officer ("CFO") at all relevant times.

16. Defendants Potter and Miller (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

17.  Grocery Outlet Holding Corp. operates as a retailer of consumables and fresh products sold through independently operated stores in the United States. The Company initiated a Restructuring Plan during the fourth quarter of fiscal 2024, which was purportedly substantially completed in the second quarter of fiscal 2025, intended to improve long-term profitability, cash flow generation and return on invested capital, optimize the footprint of new store growth and lower the Company's cost base.

**Materially False and Misleading**

**Statements Issued During the Class Period**

18.    The Class Period begins on August 5, 2026.[1] On that day, Grocery Outlet announced its financial results for the fiscal quarter ended June 28, 2025. The press release touted, among other things, that "[n]et sales increased 4.5% to $1.18 billion during the second quarter" which the Company attributed to the fact the Company continued to add "*new store sales,*" including the opening of "11 new stores" in the second quarter alone. The Company also noted that the Restructuring Plan intended to, among other things "optimize the footprint of new store growth and lower the cost base" was "substantially completed in the second quarter of fiscal 2025." The press release concluded with the Company reaffirming its full year guidance figures for fiscal 2025, other than earnings per share, which was increased. Specifically, the press release stated as follows, in relevant part:

> **Highlights for Second Quarter Fiscal 2025 as compared to Second Quarter Fiscal 2024:**
>
> •Net sales increased by 4.5% to $1.18 billion.
> •Comparable store sales increased by 1.1%.
> •Gross margin was 30.6% compared to 30.9% last year.
> •SG&A increased by 4.2% to $336.8 million.
> •Operating income was $12.8 million, which included $11.2 million in restructuring charges.
> •Net income was $5.0 million, or $0.05 per diluted share, compared to net income of $14.0 million, or $0.14 per diluted share last year. Adjusted net income was $22.8 million, or $0.23 diluted adjusted earnings per share, compared to $25.1 million, or $0.25 diluted adjusted earnings per share last year.
> •Adjusted EBITDA was $67.7 million, representing 5.7% of net sales.
>
> \*                    \*                    \*
>
> **Second Quarter Fiscal 2025 Financial Summary**
>
> Net sales increased 4.5% to $1.18 billion during the second quarter due to new store sales and a 1.1% increase in comparable store sales, which was positively impacted by the timing shift of the Easter holiday compared to the prior year. The increase in comparable store sales was driven by a 1.5% increase in the number of transactions, partially offset by a 0.4% decrease in average transaction size. We opened 11 new stores and closed two stores, ending the quarter with 552 stores in 16 states. Starting in the second quarter of fiscal 2025, comparable stores sales include the addition of stores from the acquisition of United Grocery Outlet on April 1, 2024.

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

*          *          *

**Restructuring Plan:**

The Company initiated a restructuring plan during the fourth quarter of fiscal 2024, with continuing implementation in fiscal 2025, intended to improve long-term profitability, cash flow generation and return on invested capital, optimize the footprint of new store growth and lower the Company's cost base (the "Restructuring Plan"). The Restructuring Plan includes (i) the termination of a total of 28 leases for unopened stores in suboptimal locations and the discontinued development of certain future store sites where we had incurred initial costs, but leases had not yet been signed, (ii) the cancellation of certain capital-intensive warehouse projects and (iii) a reduction in headcount in building a more scalable cost structure. As of June 28, 2025, the Company estimates that it will incur total costs under the Restructuring Plan of approximately $63 million, of which approximately $39 million is expected to be cash expenditures. All costs incurred during the second quarter and first half of fiscal 2025 are included in Restructuring charges on the condensed consolidated statements of operations and comprehensive income (loss). The actions under the Restructuring Plan were substantially completed in the second quarter of fiscal 2025.

**Outlook:**

The Company is maintaining key guidance figures for fiscal 2025, other than diluted adjusted earnings per share which are updated as shown in the current guidance as follows:

| | Previous | Current |
|---|---|---|
| New store openings, net | 33 to 35 | 33 to 35 |
| Net sales | $4.7 billion to $4.8 billion | $4.7 billion to $4.8 billion |
| Comparable store sales increase[3] | 1.0% to 2.0% | 1.0% to 2.0% |
| Gross margin | 30.0%-30.5% | 30.0%-30.5% |
| Adjusted EBITDA[1] | $260 million to $270 million | $260 million to $270 million |
| Diluted adjusted earnings per share[1] | $0.70 to $0.75 | $0.75 to $0.80 |
| Capital expenditures (net of tenant improvement allowances) | $210 million | $210 million |

19.　　On August 6, 2025, the Company submitted its quarterly report for the period ended June 28, 2025 on a Form 10-Q filed with the SEC, affirming the previously reported financial results and further reporting additional financial and operations data concerning new stores opened. Specifically, the report stated as follows, in relevant part:

CLASS ACTION COMPLAINT

6

|  | June 28, 2025 | December 28, 2024 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 55,190 | $ 62,828 |
| Independent operator receivables and current portion of independent operator notes, net of allowance $9,780 and $5,770 | 16,179 | 16,051 |
| Other accounts receivable, net of allowance $9 and $9 | 4,544 | 4,166 |
| Merchandise inventories | 398,225 | 394,152 |
| Prepaid expenses and other current assets | 27,397 | 26,701 |
| Total current assets | 501,535 | 503,898 |
| Independent operator notes and receivables, net of allowance $13,398 and $12,709 | 39,603 | 36,441 |
| Property and equipment, net | 806,740 | 750,423 |
| Operating lease right-of-use assets | 1,105,419 | 1,014,678 |
| Intangible assets, net | 80,681 | 78,778 |
| Goodwill | 782,835 | 782,734 |
| Other assets | 5,563 | 6,869 |
| Total assets | $ 3,322,376 | $ 3,173,821 |

\*                    \*                    \*

|  | 13 Weeks Ended | | 26 Weeks Ended | |
|---|---|---|---|---|
|  | June 28, 2025 | June 29, 2024 | June 28, 2025 | June 29, 2024 |
| Net sales | $ 1,179,772 | $ 1,128,520 | $ 2,305,339 | $ 2,165,464 |
| Cost of sales | 819,079 | 779,280 | 1,602,201 | 1,512,279 |
| Gross profit | 360,693 | 349,240 | 703,138 | 653,185 |
| Selling, general and administrative expenses | 336,764 | 323,135 | 667,842 | 626,517 |
| Restructuring charges | 11,157 | — | 45,032 | — |
| Operating income (loss) | 12,772 | 26,105 | (9,736) | 26,668 |
| Interest expense, net | 6,544 | 5,559 | 13,064 | 8,735 |
| Income (loss) before income taxes | 6,228 | 20,546 | (22,800) | 17,933 |
| Income tax expense (benefit) | 1,267 | 6,545 | (4,444) | 4,957 |
| Net income (loss) and comprehensive income (loss) | $ 4,961 | $ 14,001 | $ (18,356) | $ 12,976 |
| Basic earnings (net loss) per share | $ 0.05 | $ 0.14 | $ (0.19) | $ 0.13 |
| Diluted earnings (net loss) per share | $ 0.05 | $ 0.14 | $ (0.19) | $ 0.13 |
| Weighted-average shares outstanding: | | | | |
| Basic | 98,081 | 99,542 | 97,801 | 99,531 |
| Diluted | 98,460 | 100,369 | 97,801 | 100,753 |

\*                    \*                    \*

|  | 13 Weeks Ended | | 26 Weeks Ended | |
|---|---|---|---|---|
|  | June 28, 2025 | June 29, 2024 | June 28, 2025 | June 29, 2024 |
| **Other Financial and Operations Data** | | | | |
| Number of new stores [1] | 11 | 51 | 22 | 57 |
| Number of stores open at end of period | 552 | 524 | 552 | 524 |
| Comparable store sales increase [2] | 1.1 % | 2.9 % | 0.7 % | 3.4 % |
| EBITDA [3] | $ 44,106 | $ 52,650 | $ 51,495 | $ 78,102 |
| Adjusted EBITDA [3] | $ 67,747 | $ 67,878 | $ 119,632 | $ 107,273 |
| Adjusted net income [3] | $ 22,766 | $ 25,095 | $ 35,773 | $ 33,904 |

\*                    \*                    \*

***New Store Growth.*** Planned construction and opening of new stores has been, and may continue to be, negatively impacted due to both increased lead times to acquire materials, obtain permits and licenses, hook up utilities as well as higher construction and development related costs. Recently implemented and proposed tariffs could further impact our constructions costs.

Our new store growth efforts are focused on organic growth combined with complementary real estate opportunities that align with our long-term geographic expansion and store growth strategies. Complementary growth opportunities may include expanding strategic relationships with large property owners, evaluating

CLASS ACTION COMPLAINT

7

acquisitions of opportunistic real estate that become available through consolidation in the retail sector, and exploring strategic regional acquisitions of operating businesses. On April 1, 2024, we acquired The Bargain Barn, Inc., a Tennessee corporation doing business as United Grocery Outlet ("United Grocery Outlet"), which included 40 stores in six adjacent states we did not operate in as of such date (Tennessee, North Carolina, Georgia, Alabama, Kentucky and Virginia) and a company-operated distribution center. The acquisition provides us with the opportunity to scale in a new region and is a platform for potential future expansion in the Southeast. Our near-term integration focus is expanding the assortment, investing in store refreshes and new fixtures and introducing some of our marketing programs to the Southeast region. We opened 22 stores and closed 3 stores in the first half of fiscal 2025 and plan to open 33 to 35 net new stores in fiscal 2025.

20.     On November 4, 2025, Grocery Outlet announced its financial results for the fiscal quarter ended September 27, 2025 including that "Net sales increased by 5.4% to $1.17 billion" which the Company attributed to the fact the Company continued to add "***new store sales,***" including the opening of "13 new stores" in the second quarter alone. The Company also noted that the Restructuring Plan intended to, among other things "optimize the footprint of new store growth and lower the cost base" was "substantially completed in the second quarter of fiscal 2025." The press release concluded with the Company revised full year guidance figures for fiscal 2025. Specifically, the press release stated as follows, in relevant part:

**Highlights for Third Quarter Fiscal 2025 as compared to Third Quarter Fiscal 2024:**

•Net sales increased by 5.4% to $1.17 billion.
•Comparable store sales increased by 1.2%.
•Gross margin was 30.4% compared to 31.1% last year.
•SG&A increased by 8.7% to $331.0 million.
•Operating income was $22.8 million, which included $1.3 million in restructuring charges.
•Net income was $11.6 million, or $0.12 per diluted share, compared to $24.2 million, or $0.24 per diluted share last year. Adjusted net income was $20.7 million, or $0.21 diluted adjusted earnings per share, compared to $27.9 million, or $0.28 diluted adjusted earnings per share last year.
•Adjusted EBITDA was $66.7 million, representing 5.7% of net sales.

\*                    \*                    \*

**Third Quarter Fiscal 2025 Financial Summary**

Net sales increased 5.4% versus last year to $1.17 billion due to new store sales and a 1.2% increase in comparable store sales. The increase in comparable store sales was driven by a 1.8% increase in the number of transactions, partially offset by a 0.6% decrease in average transaction size. We opened 13 new stores and closed two stores, ending the quarter with 563 stores in 16 states.

\*                              \*                              \*

**Restructuring Plan:**

As previously reported, the Company initiated a restructuring plan during the fourth quarter of fiscal 2024, with continued implementation in fiscal 2025, intended to improve long-term profitability, cash flow generation and return on invested capital, optimize the footprint of new store growth and lower the Company's cost base (the "Restructuring Plan"). The Restructuring Plan included (i) the termination of a total of 28 leases for unopened stores in suboptimal locations and the discontinued development of certain future store sites where we had incurred initial costs, but leases had not yet been signed, (ii) the cancellation of certain capital-intensive warehouse projects and (iii) a reduction in headcount in building a more scalable cost structure. As of September 27, 2025, the Company incurred total costs under the Restructuring Plan of $62 million, of which $38 million were cash expenditures. All costs incurred during the third quarter and first three quarters of fiscal 2025 are included in Restructuring charges on the condensed consolidated statements of operations and comprehensive income (loss). The actions under the Restructuring Plan were substantially completed in the second quarter of fiscal 2025.

**Outlook**:

The Company has revised key guidance figures for fiscal 2025 as shown in the current guidance as follows:

| | Previous | Current |
|---|---|---|
| New store openings, net | 33 to 35 | 37 |
| Net sales | $4.7 billion to $4.8 billion | $4.70 billion to $4.72 billion |
| Comparable store sales increase[3] | 1.0% to 2.0% | 0.6% to 0.9% |
| Gross margin | 30.0%-30.5% | 30.3%-30.4% |
| Adjusted EBITDA[1] | $260 million to $270 million | $258 million to $262 million |
| Diluted adjusted earnings per share[1] | $0.75 to $0.80 | $0.78 to $0.80 |
| Capital expenditures (net of tenant improvement allowances) | $210 million | $210 million |

21.    On November 5, 2026, the Company submitted its quarterly report for the period ended September 27, 2025 on a Form 10-Q filed with the SEC, affirming the previously reported financial results and further reporting additional financial and operations data concerning new stores opened. Specifically, the report stated as follows, in relevant part:

| | September 27, 2025 | December 28, 2024 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 52,125 | $ 62,828 |
| Independent operator receivables and current portion of independent operator notes, net of allowance $11,551 and $5,770 | 15,511 | 16,051 |
| Other accounts receivable, net of allowance $9 and $9 | 3,641 | 4,166 |
| Merchandise inventories | 417,846 | 394,152 |
| Prepaid expenses and other current assets | 28,335 | 26,701 |
| Total current assets | 517,458 | 503,898 |
| Independent operator notes and receivables, net of allowance $14,015 and $12,709 | 41,207 | 36,441 |
| Property and equipment, net | 818,130 | 750,423 |
| Operating lease right-of-use assets | 1,123,785 | 1,014,678 |
| Intangible assets, net | 80,098 | 78,778 |
| Goodwill | 782,835 | 782,734 |
| Other assets | 5,125 | 6,869 |
| Total assets | $ 3,368,638 | $ 3,173,821 |

\*                            \*                            \*

| | | 13 Weeks Ended | | | 39 Weeks Ended | |
|---|---|---|---|---|---|---|
| | | September 27, 2025 | September 28, 2024 | | September 27, 2025 | September 28, 2024 |
| Net sales | $ | 1,168,153 | $ 1,108,183 | $ | 3,473,492 | $ 3,273,647 |
| Cost of sales | | 813,017 | 763,311 | | 2,415,218 | 2,275,590 |
| Gross profit | | 355,136 | 344,872 | | 1,058,274 | 998,057 |
| Selling, general and administrative expenses | | 331,016 | 304,586 | | 998,858 | 931,103 |
| Restructuring charges | | 1,296 | — | | 46,328 | — |
| Operating income | | 22,824 | 40,286 | | 13,088 | 66,954 |
| Interest expense, net | | 6,705 | 6,439 | | 19,769 | 15,174 |
| Income (loss) before income taxes | | 16,119 | 33,847 | | (6,681) | 51,780 |
| Income tax expense | | 4,514 | 9,669 | | 70 | 14,626 |
| Net income (loss) and comprehensive income (loss) | $ | 11,605 | $ 24,178 | $ | (6,751) | $ 37,154 |
| Basic earnings (net loss) per share | $ | 0.12 | $ 0.25 | $ | (0.07) | $ 0.37 |
| Diluted earnings (net loss) per share | $ | 0.12 | $ 0.24 | $ | (0.07) | $ 0.37 |
| Weighted-average shares outstanding: | | | | | | |
| Basic | | 98,160 | 98,359 | | 97,921 | 99,140 |
| Diluted | | 98,705 | 98,933 | | 97,921 | 100,146 |

\*                            \*                            \*

| | | 13 Weeks Ended | | | 39 Weeks Ended | |
|---|---|---|---|---|---|---|
| | | September 27, 2025 | September 28, 2024 | | September 27, 2025 | September 28, 2024 |
| Other Financial and Operations Data | | | | | | |
| Number of new stores [1] | | 13 | 5 | | 35 | 62 |
| Number of stores open at end of period | | 563 | 529 | | 563 | 529 |
| Comparable store sales increase [2] | | 1.2 % | 1.2 % | | 0.9 % | 2.6 % |
| EBITDA [3] | $ | 56,214 | $ 68,101 | $ | 107,709 | $ 146,203 |
| Adjusted EBITDA [3] | $ | 66,668 | $ 72,258 | $ | 186,300 | $ 179,531 |
| Adjusted net income [3] | $ | 20,687 | $ 27,853 | $ | 56,460 | $ 61,757 |

\*                            \*                            \*

***New Store Growth.*** Planned construction and opening of new stores has been, and may continue to be, negatively impacted due to both increased lead times to acquire materials, obtain permits and licenses, hook up utilities as well as higher construction and development related costs. Recently implemented and proposed tariffs could further impact our constructions costs.

Our new store growth efforts are focused on organic growth combined with complementary real estate opportunities that align with our long-term geographic expansion and store growth strategies. Complementary growth opportunities may include expanding strategic relationships with large property owners, evaluating acquisitions of opportunistic real estate that become available through consolidation in the retail sector, and exploring strategic regional acquisitions of operating businesses. On April 1, 2024, we acquired The Bargain Barn, Inc., a Tennessee corporation doing business as United Grocery Outlet ("United Grocery Outlet"), which included 40 stores in six adjacent states we did not operate in as of such date (Tennessee, North Carolina, Georgia, Alabama, Kentucky and Virginia) and a company-operated distribution center. The acquisition provides us with the opportunity to scale in a new region and is a platform for potential future expansion in the Southeast. Our near-term integration focus is expanding the assortment, investing in store refreshes and new fixtures and introducing some of our marketing programs to the Southeast region. We opened 35 stores and closed 5 stores in the first three quarters of fiscal 2025 and plan to open 37 net new stores in fiscal 2025.

22.    The above statements identified in ¶¶18-21 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and

prospects. Specifically, Defendants failed to disclose to investors: (1) the Company had "expanded too quickly" into new stores; (2) the Company's purportedly strong financial and operational growth was being artificially supported by excessive, rapid store expansion; (3) as a result, the Company was unable to achieve the sustainable growth required to meet its previously set guidance; (4) the Company's Restructuring Plan would require further Optimization to achieve its operational goals, including significant store closures and asset write-downs; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Disclosures at the End of the Class Period**

23.     On March 4, 2026, after the market closed, Grocery Outlet announced results for the fourth quarter and full fiscal year 2025, revealing the Company's full year financial results which missed guidance on nearly every major financial metric. The Company reported full year 2025 adjusted EBITDA of $254.3 million (missing prior guidance of $258 at the low end); net sales of $4.69 billion, (missing prior guidance of $4.70 billion at the low end); comparable store sales which increased by 0.5% on a 52-week basis (missing prior guidance of 0.6% to 0.9%), and diluted adjusted earnings per share of $0.76 (missing prior guidance of $0.78 at the low end). Moreover, the Company revealed it was adding an additional "optimization plan" on top of its "restructuring plan," and "reshaping [its] new store growth strategy" including the "closure of 36 financially underperforming stores." Further, the Company also "determined that the long-lived assets of the Closure Stores were impaired, and recognized $110 million of non-cash charges in Impairment of long-lived assets on the condensed consolidated statements of operations and comprehensive income (loss)." Finally, the Company stated that it estimates "between $14 million and $25 million in net total restructuring charges in fiscal 2026, including between $51 million and $63 million of estimated cash expenditures primarily for lease termination fees, and between $11 million and $14 million of bad debt expense, partially offset by net non-cash write-off of right-of-use assets and

lease liabilities associated with these leases of between $(48) million and $(52) million."

Specifically, the press release stated as follows, in relevant part:

**Highlights for Fourth Quarter Fiscal 2025 as compared to Fourth Quarter Fiscal 2024:**

•Net sales increased by 10.7% to $1.22 billion, which includes $82.4 million from the 53rd week.
•Comparable store sales declined by 0.8% on a 13-week basis.
•Gross margin was 29.7% compared to 29.5% last year.
•Operating loss was $234.8 million, which included $110.2 million in non-cash impairment of long-lived assets and $149.0 million in non-cash goodwill impairment.
•Net loss was $218.2 million, or $(2.22) per diluted share, compared to net income of $2.3 million, or $0.02 per diluted share last year. Adjusted net income(1) was $18.7 million, or $0.19 diluted adjusted earnings per share(1), compared to $14.5 million, or $0.15 diluted adjusted earnings per share(1) last year.
•Adjusted EBITDA(1) was $68.0 million, representing 5.6% of net sales.

**Highlights for Fiscal 2025 as compared to Fiscal 2024:**

•Net sales increased by 7.3% to $4.69 billion.
•Comparable store sales increased by 0.5% on a 52-week basis.
•Gross margin was 30.3% compared to 30.2% last year.
•Operating loss was $221.7 million, which included $113.8 million in non-cash impairment of long-lived assets, $45.9 million in restructuring charges and $149.0 million in non-cash goodwill impairment.
•Net loss was $224.9 million, or $(2.30) per diluted share, compared to net income of $39.5 million, or $0.40 per diluted share last year. Adjusted net income(1) was $75.2 million, or $0.76 diluted adjusted earnings per share(1), compared to $76.3 million, or $0.77 diluted adjusted earnings per share(1) last year.
•Adjusted EBITDA(1) increased by 7.4% to $254.3 million, representing 5.4% of net sales.

"We made progress on our strategic priorities in 2025; however, our fourth-quarter results made clear that we have more work to do, and we're moving quickly," said Jason Potter, President and CEO of Grocery Outlet. "Consumer pressure intensified, federally funded benefits were delayed, and competition grew more promotional in the fourth quarter. In response, we have begun to sharpen our focus on what matters most: delivering clearer value and a better in-store experience. We're intensely focused on restoring the opportunistic mix to rebuild value perception with the customer and advancing our store refresh program, and we're already seeing early, measurable improvements. At the same time, we're closing underperforming stores, reshaping our new store growth strategy and reallocating resources to strengthen operating results and returns on capital. We are confident that we have identified the core challenges, and now have the right plans in place and the right team to execute them."

*                    *                    *

**Optimization Plan and Restructuring Plan:**

To strengthen long-term profitability and cash flow generation, improve operational execution, optimize our existing store footprint and align with our disciplined new store growth strategy, in the first quarter of fiscal 2026 we conducted a strategic, financial and operational analysis of our store fleet. Following that review, on March 2, 2026, our Board of Directors adopted the Optimization Plan that provides for the closure of 36 financially underperforming stores, including the termination or sublease of the applicable store leases, the termination or sublease of a lease for a distribution center facility that we are no longer utilizing, and the termination of operator agreements with independent operators ("IOs") for the applicable store locations as well as certain other store locations. These actions under the Optimization Plan are expected to be substantially completed during fiscal 2026.

In addition, preceding the adoption of the Optimization Plan, during the reporting process for the audited consolidated financial statements for fiscal 2025, we determined that the long-lived assets of the Closure Stores were impaired, and recognized $110 million of non-cash charges in Impairment of long-lived assets on the condensed consolidated statements of operations and comprehensive income (loss).

In connection with the Optimization Plan, we currently estimate we will incur between $14 million and $25 million in net total restructuring charges in fiscal 2026, including between $51 million and $63 million of estimated cash expenditures primarily for lease termination fees, and between $11 million and $14 million of bad debt expense, partially offset by net non-cash write-off of right-of-use assets and lease liabilities associated with these leases of between $(48) million and $(52) million.

In addition to the above costs, we estimate that our fiscal 2026 gross profit may be negatively impacted by between $4 million and $6 million as a result of sales discounts or product markdowns to liquidate on-hand inventory during the wind-down of operations of the Closure Stores.

As previously reported, the Company initiated a restructuring plan during the fourth quarter of fiscal 2024, which was substantially completed in the second quarter of fiscal 2025, intended to improve long-term profitability, cash flow generation and return on invested capital, optimize the footprint of new store growth and lower the Company's cost base (the "Restructuring Plan"). As of January 3, 2026, the Company incurred total costs under the Restructuring Plan of $61.8 million, including (i) $15.9 million of non-cash impairment of long-lived assets in fiscal 2024, and (ii) $38.2 million of cash expenditures and $7.7 million of non-cash impairment and disposal of long-lived assets in fiscal 2025. All costs incurred under the Restructuring Plan are included in Restructuring charges on the condensed consolidated statements of operations and comprehensive income (loss).

24.    On the same date, the Company held an earnings call in conjunction with releasing fourth quarter 2025 results. During the earnings call, the Company's CEO, Defendant Potter, further revealed that the Company had "made the difficult decision to close 36 locations" in part because "it's clear now that we expanded too quickly, and these closures are a direct correction." Specifically, during the earnings call, Defendant Potter stated as follows, in relevant part:

Following a rigorous analysis of the fleet, we identified 36 stores in the network that we concluded did not have a viable path to sustained profitability regardless of the operational support we could provide. We've made the difficult decision to close 36 locations, 24 of which are located in the East, representing roughly 30% of that region's fleet. We are not fully exiting any state, and we believe we have a meaningful opportunity to grow in the East over the long term. However, it's clear now that we expanded too quickly, and these closures are a direct correction.

25.     On this news, Grocery Outlet's stock price fell $2.45, or 27.9%, to close at $6.34 per share on March 5, 2026, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Grocery Outlet securities between August 5, 2025 and March 4, 2026, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

27.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Grocery Outlet's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Grocery Outlet shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Grocery Outlet or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

28.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

29.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

30.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Grocery Outlet; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

31.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

32.    The market for Grocery Outlet's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Grocery Outlet's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Grocery Outlet's securities relying upon the integrity of the market price of the Company's securities and market information relating to Grocery Outlet, and have been damaged thereby.

33.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Grocery Outlet's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or

misrepresented the truth about Grocery Outlet's business, operations, and prospects as alleged herein.

34.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Grocery Outlet's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

35.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

36.    During the Class Period, Plaintiff and the Class purchased Grocery Outlet's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

37.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their

receipt of information reflecting the true facts regarding Grocery Outlet, their control over, and/or receipt and/or modification of Grocery Outlet's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Grocery Outlet, participated in the fraudulent scheme alleged herein.

<b>APPLICABILITY OF PRESUMPTION OF RELIANCE</b>

<b><u>(FRAUD-ON-THE-MARKET DOCTRINE)</u></b>

38. The market for Grocery Outlet's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Grocery Outlet's securities traded at artificially inflated prices during the Class Period. On September 2, 2025, the Company's share price closed at a Class Period high of $18.66 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Grocery Outlet's securities and market information relating to Grocery Outlet, and have been damaged thereby.

39. During the Class Period, the artificial inflation of Grocery Outlet's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Grocery Outlet's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Grocery Outlet and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

40. At all relevant times, the market for Grocery Outlet's securities was an efficient market for the following reasons, among others:

(a) Grocery Outlet shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Grocery Outlet filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Grocery Outlet regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Grocery Outlet was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

41.     As a result of the foregoing, the market for Grocery Outlet's securities promptly digested current information regarding Grocery Outlet from all publicly available sources and reflected such information in Grocery Outlet's share price. Under these circumstances, all purchasers of Grocery Outlet's securities during the Class Period suffered similar injury through their purchase of Grocery Outlet's securities at artificially inflated prices and a presumption of reliance applies.

42.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**NO SAFE HARBOR**

43.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Grocery Outlet who knew that the statement was false when made.

**FIRST CLAIM**

**Violation of Section 10(b) of The Exchange Act and**

**Rule 10b-5 Promulgated Thereunder**

**Against All Defendants**

44.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

45.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Grocery Outlet's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

46.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements

not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Grocery Outlet's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

47.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Grocery Outlet's financial well-being and prospects, as specified herein.

48.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Grocery Outlet's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Grocery Outlet and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

49.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's

dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

50.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Grocery Outlet's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

51.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Grocery Outlet's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Grocery Outlet's securities during the Class Period at artificially high prices and were damaged thereby.

52.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Grocery Outlet was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Grocery Outlet securities, or, if they

had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

53.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

54.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

55.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

56.     Individual Defendants acted as controlling persons of Grocery Outlet within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

57.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

58.    As set forth above, Grocery Outlet and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: March 16, 2026

**GLANCY PRONGAY WOLKE & ROTTER LLP**

By:    */s/Charles H. Linehan*
Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  rprongay@glancylaw.com
        clinehan@glancylaw.com
        prajesh@glancylaw.com

**HOLZER & HOLZER, LLC**
Corey Daniel Holzer
211 Perimeter Center Parkway, Suite 1010
Atlanta, GA 30346
Telephone: (770) 392-0090
Email: cholzer@holzerlaw.com

*Attorneys for Plaintiff Trevor Jones*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, __Trevor Jones_____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Grocery Outlet Holding Corp. ("Grocery Outlet" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Grocery Outlet securities at the direction of counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Grocery Outlet securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in Grocery Outlet securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**Executed** ___3/16/2026_____
                         **(Date)**

DocuSigned by:

*Trevor Jones*

AF0BCF88B8994E6...

_____
**(Signature)**

___Trevor Jones_____
**(Type or Print Name)**

## SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| 11/06/2025 | Purchase | 326 | $12.24 |
| 01/09/2026 | Sale | 114 | $9.59 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |