POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
T: (310) 405-7190
jpafiti@pomlaw.com

Luc W. M. Mitchell (SBN 355909)
600 Third Avenue, 20th Floor
New York, New York 10016
T: (212) 661-1100
lmitchell@pomlaw.com

LEVI & KORSINSKY, LLP
Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
T: (415) 373-1671
aapton@zlk.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| IN RE GROCERY OUTLET HOLDING CORP. SECURITIES LITIGATION<br><br>THIS DOCUMENT RELATES TO: ALL ACTIONS | Case No. 4:26-cv-02291-AMO<br><br>CLASS ACTION<br><br>AMENDED COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS


NATURE OF THE ACTION ........ 1

JURISDICTION AND VENUE ........ 4

PARTIES ........ 5

SUBSTANTIVE ALLEGATIONS ........ 6

A. Grocery Outlet ........ 6

B. 2006–24: A Period Of Rapid Expansion ........ 7

C. 2024–25: The Restructuring Plan ........ 10

D. 2025: Grocery Outlet Finishes Restructuring And Touts Store Growth ........ 13

E. 2025–26: Unbeknownst To Investors, Grocery Outlet Knew That Stores Remained Unviable ........ 14

Materially False and Misleading Statements ........ 16

The Truth Is Revealed ........ 44

ADDITIONAL SCIENTER ALLEGATIONS ........ 47

A. The Defendants' Admissions Support A Strong Inference Of Scienter ........ 47

B. That The Defendants Held Themselves Out As Particularly Knowledgeable And Well Versed In Turnaround Scenarios Shows They Closely Monitored And Tracked Store Performance ........ 49

C. Defendants' Involvement In The Reorganization Plan And The Optimization Plan Supports Scienter ........ 50

D. Senior Leadership Regularly Discussed Information In Meetings And Regular Reports That Was Readily Accessible To The Individual Defendants ........ 51

E. Corporate Scienter ........ 53

LOSS CAUSATION ........ 53

PLAINTIFF'S CLASS-ACTION ALLEGATIONS ........ 55

PRESUMPTION OF RELIANCE ........ 58

NO STATUTORY SAFE HARBOR....59
COUNT I....60
COUNT II....63
PRAYER FOR RELIEF....64
DEMAND FOR TRIAL BY JURY....65

1. Plaintiff Mark Blosser, by and through his undersigned attorneys, brings this class action pursuant to 15 U.S.C. §§ 78j(b) and 78t(a) ("Section 10(b)" and "Section 20(a)," respectively) of the Securities Exchange Act of 1934 (the "Exchange Act") and 17 C.F.R. § 240.10b-5 ("Rule 10b-5") promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), individually and on behalf of all persons and entities that purchased or otherwise acquired Grocery Outlet Holding Corp. ("Grocery Outlet" or the "Company") securities between February 25, 2025, and March 4, 2026, inclusive (the "Class Period") and were damaged thereby.

2. Plaintiff alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, amongst other things, his counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Grocery Outlet with the SEC; (b) review and analysis of press releases and media reports issued and disseminated by Grocery Outlet; (c) review and analysis of reports of securities and financial analysts, news articles, and other commentary and analysis concerning Grocery Outlet and the industry in which it operates; (d) review of other publicly available information concerning Grocery Outlet; and (e) interviews with former employees of Grocery Outlet.

3. Co-Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

4. Plaintiff brings this securities-fraud class action alleging that, throughout the Class Period, Grocery Outlet, its President & Chief Executive Officer ("CEO"), its Chief Financial

Officer ("CFO"), and the Chairman of its Board, knowingly or severely recklessly made material misrepresentations to investors concerning (i) the rapid expansion of its stores across the United States, (ii) the strength of Grocery Outlet's nationwide fleet of stores, and (iii) a "Restructuring Plan" to purportedly address problems with the Company's rapid expansion.

5. Grocery Outlet operates as a retailer of consumables and fresh products sold through independently operated stores in the United States. Following several decades of rapid expansion, the Company now oversees approximately 550 stores across the United States; the majority flank the West Coast, with a substantial minority along the East.

6. On February 25, 2025, at the beginning of the Class Period, Grocery Outlet announced what it termed a "Restructuring Plan." Touted by its new CEO and CFO, the former of whom characterized himself a turnaround expert in the grocery space, the Restructuring Plan aimed to slow the Company's pace of expansion—it terminated leases for more than two dozen planned but unopened stores, and cut down on the Company's headcount. By its own admission, the Company had been "trying to do too much too fast." Now, it said, it was slowing down.

7. Yet at the same time, Grocery Outlet championed its fundamentals. Its continued ability to expand, it confirmed, was "demonstrated by the success of our stores across a broad range of geographies, population densities and demographic groups." It confirmed that new-store growth was vital to its topline numbers, repeatedly pointing to how increases in net sales were "due to new store sales." And it gave no indication that the stores it was opening at a breakneck pace—particularly those along the eastern seaboard—were floundering.

8. A look behind the proverbial veil would have told a different story. The Company lacked the personnel to support its expansion; outsourcing its site selection to an AI-driven tool, it had repeatedly placed new stores in blighted areas, with more pests than people. Regional managers were stretched thin, and unable to manage their many (and geographically dispersed)

stores. Employees felt whipsawed between strategic U-turns, where the only constant was a relentless focus on expansion.

9. At the same time that the Defendants touted their expansion, therefore, store performance was in a downward spiral. Stores were failing basic inventories; operators, who had been lured in with pitches that they could "win a million dollars," were instead being castigated for poor performance, and warned that they would receive deficiency letters. Regular meetings to discuss performance, including with the CIO, focused on the disparity between the few stores that were performing well, and the majority that were suffering; underperforming stores were expected to justify their low numbers on the calls. The meetings, one participant recalled, were "uneven and often tense," and marked by the CIO's yelling. Meanwhile, the calls frequently focused on stores in California and Oregon—those closest to Grocery Outlet's roots—and ignored those farther afield.

10. Though the Restructuring Plan was declared completed six months later, its lofty pronouncements had done nothing to address—or even acknowledge—the deep-seated issues with the Company's existing stores. In fact, it dug them deeper. Its employee terminations, which Grocery Outlet did not publicly itemize, had taken direct aim at key teams and roles that were designed to support new stores: the New Store Set Team, the New Store Support Team, the New Store Transition Coach. In its purported focus on precarious *future* stores, Grocery Outlet failed to inform investors that it was vitiating the support systems for *new* stores.

11. The truth was finally revealed on March 4, 2026, when Grocery Outlet announced its results for the preceding fiscal year. Missing nearly every major financial metric, the Company—fresh off its Restructuring Plan—now announced an "Optimization Plan." Now, Grocery Outlet said, it was cutting dozens of underperforming stores—including ***30% of the East Coast fleet***. Far from the geographic-agnostic success of which Grocery Outlet had once boasted,

now, it admitted, the East was a place it did not fully "understand." There, "the network is relatively new. The experience of the team is obviously at a different place than it is in a place like California."

12. Analysts and investors were shocked. "The bar was low," one wrote; "this was worse." It concluded that investors should "[w]atch from the sidelines." As another put it, "[u]ntil the strategic surprises cease, the shares may not re-rate." And when markets opened, Grocery Outlet's stock plummeted by 27.9%.

13. During the Class Period, the Defendants' fraudulent and misleading statements served to artificially inflate the price of Grocery Outlet's securities; the revelation of the truth caused massive investor losses when the price of those securities precipitously declined. Plaintiff hereby seeks damages individually, and on behalf of the Class.

## JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged fraud or the effects of the fraud occurred in this District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District. Furthermore, Grocery Outlet's principal executive offices are located in this District.

17. In connection with the acts alleged in this complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

18. Plaintiff, as set forth in the previously filed certification (ECF No. 25-4), incorporated by reference herein, acquired Grocery Outlet securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

19. Defendant Grocery Outlet is incorporated under the laws of Delaware and has its principal executive offices in Hayward, California. Grocery Outlet's common stock trades on the Nasdaq stock market under the symbol GO.

20. Defendant Jason Potter was the Company's CEO at all relevant times.

21. Defendant Christopher M. Miller was the Company's CFO at all relevant times.

22. Defendant Eric J. Lindberg, Jr. was the Company's Chairman of the Board at all relevant times.

23. Defendants Potter, Miller, and Lindberg (together, the "Individual Defendants") possessed the power and authority to control the contents of Grocery Outlet's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Grocery Outlet's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Grocery Outlet, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and

misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### A. Grocery Outlet

24. Grocery Outlet operates as a retailer of consumables and fresh products sold through independently operated stores in the United States. The Company oversees approximately 550 stores across the United States. Using what it says is an "opportunistic buying model"—buying, for instance, excess inventory or goods that have since undergone packaging changes—the Company pitches itself as a discount retailer of premium products. "At Grocery Outlet," it declares, "we love brands. Like, ***really*** love them."

25. The Company sells what it calls "[a]n ever-changing assortment of 'WOW!' deals, complemented by everyday staple products." Its website seeks to reinforce this breadth—the background is a collage of brand logos, from Coco-Cola, to Starbucks, to Nestlé. On its leadership page, its executives each offer their "Favorite Haul," which happen to cover the bases: the brands of Starbucks Blonde Roast ("Cuppa Joe for that morning jolt"), Kind Bars ("You've got to spread a little kindness"), and Halo Top Ice Cream ("He's got the scoop on dessert"); the generics of SimplyGO Organic Blue Corn Tortilla Chips ("Our deals are un-blue-lievable!") and SimplyGO Rosa Alfredo Pasta Sauce ("When you're saving so much, the pasta-bilities are endless!"); and the staples of strawberries ("Berry low prices, berry good deals"), eggs ("Filling the company with good eggs"), and ice cream ("Strategy is about making tough choices – like which flavor of ice cream to eat for dessert…or breakfast").

26. Grocery Outlet says its stores provide "a fun, treasure hunt shopping experience in an easy-to-navigate, small-box format." This experience, it continues, "generates customer excitement and encourages frequent visits from bargain-minded shoppers."

**B. <u>2006–24: A Period Of Rapid Expansion</u>**

27. Founded as a single store in 1946, in more recent years, Grocery Outlet sought to expand aggressively. From 2006 through 2018, the Company expanded nearly threefold, from 128 to 316 stores. Following its IPO in 2019, the Company continued to grow rapidly: 347 stores by the end of 2019, 380 by the close of 2020, 415 by the close of 2021, 441 by the close of 2022, and 468 by the close of 2023. On average, Grocery Outlet was expanding by about 10% a year.

28. Even then, this was only a sliver of what Grocery Outlet declared its full potential to be. The 468 stores with which it closed out 2023, the Company said, were located in only nine states: California, Washington, Oregon, Pennsylvania, Idaho, Nevada, Maryland, New Jersey, and Ohio. Eyeing the remaining 41 (and opportunities for expansions in the existing nine), it declared that "new store growth remains our biggest driver of long-term stockholder value." It wrote that the so-called "white space" was "vast," and carried with it "the potential to operate approximately 4,800 stores across the United States." Expansions and acquisitions, it said, "will enable us to grow our store base on average approximately 10% per year."

29. If this is what Grocery Outlet was saying publicly, then a peek behind the curtain revealed a more nuanced reality.

30. For one, the Company had substantial turmoil amongst its senior leadership. In December 2022, Defendant Lindberg, who was also the Chairman of the Board, left the position as CEO, ceding his role to RJ Sheedy; less than two years later, in October 2024, the Company abruptly announced that Sheedy had "stepped down" "effectively immediately," and that Lindberg again held the reins, on an interim basis. Months later, in February 2025, he handed them to Potter.

31. The position of CFO was no different. In March 2024, Charles Bracher stepped down, and Lindsay Gray took over on an interim basis. Gray held the reins for nearly a year,

before handing them to Miller in January 2025. A year and a half later, in June 2026, the Company was again announcing a transition: Miller, it said, "is retiring," with Ian Ferry to fill his shoes.

32. Across just four years, therefore, the Company had three CEOs (one with two separate terms); across just *two* years, it had four CFOs. Other senior-executive roles similarly saw rapid turnover. In 2022, MacGregor Read—grandson of founder Jim Read, cousin of Lindberg, and Vice Chairman—stepped down. Its CIO, Harrison Lewis, was replaced in 2024 by Sandeep Chawla. A mere few months later and Chawla was out, and Kumar Mishra was in.

33. Within the Company, the rapid expansion, coupled with rapid turnover, did not go unnoticed. As recalled by CW1—a Director-Operator who worked at the Company from 2024 to 2025, sitting two seats under Chief Stores Officer Pam Burke, and one under VP of Store Operations Kristen Sherwood—Grocery Outlet's direction whipsawed with the leadership transitions. Plans were launched, leadership changed, and plans were abandoned. CW1 was hired to create a centralized contact center to liaise between stores and headquarters. Instead, these plans were abandoned amidst the turmoil, and CW1's position was eliminated. Internally, employees opined that the company was expanding too quickly, and prioritizing growth over stability.

34. CW3 recalled a similar series of events. A Store Owner Operator from shortly after Grocery Outlet's IPO until 2026, CW3 reported to a Director of Merchandising, then to a Senior Director, and then to the Head of Merchandising. These leaders focused on growth initiatives, CW3 said, yet the constant turnover made direction unclear. CW3 also recalled that the Company lacked the personnel to support the pace of expansion; it relied heavily on an AI-driven tool, Placer, to both justify expansion and determine site locations. The site locations were frequently poorly placed, such as in blighted shopping centers surrounded by vacancies, and infested with pests; counterintuitively, this frequently drove rents *higher*, because moving in

required extensive renovations. Meanwhile, regional managers were stretched thin across dozens of widely dispersed locations.

35. Store performance suffered greatly as a result. According to CW3, many stores were failing basic inventories; operators who had been lured in with recruitment pitches saying they could "win a million dollars" were instead repeatedly warned that they would receive letters for failed conditions. Operators were informed that they were replaceable, and that, if issues arose, they were expected to "write an apology letter" to the Company. The manager of HR matters for operators, David Duncan, was forced to tell Grocery Outlet that it could not simply remove operators from their stores; it had to pay out the contracts in order to do so.

36. The deteriorating metrics, CW3, said, were recorded in monthly store-performance reports with detailed financials. The reports were then reviewed on Zoom calls with leadership including Eric DeFrancisco, the Executive Director of Marketing/VP Operations East Coast. Stores that showed low numbers, or large swings in sales, were expected to explain the variance on the calls. In addition, separate monthly financial reviews with each store took place over Zoom; these included the operator, a C-level accountant, and a regional representative. The corporate employees then compiled the information for review by executives including the CFO.

37. In addition, CW3 said that Grocery Outlet maintained a program called TCAP—Temporary Commission-Adjustment Payment. The program provided daily supplemental payments to stores in developing or slow-growth areas, helping them remain financially stable while sales increased. TCAP was a "training wheel," CW3 said, giving stores time to build customer traffic or benefit from broader regional marketing efforts. In return for participation in TCAP, stores had their customer accounts reviewed closely, with focus on metrics as detailed as

basket size and purchasing patterns; these stores were included in additional monthly calls focused on store performance.

### C. 2024–25: The Restructuring Plan

38. By the close of 2024, Grocery Outlet had continued with the pace of expansion: It now boasted a footprint of 533 stores, reflecting 14% year-over-year growth. Yet as it then publicly reported, the growth had come with growing pains. In its annual report for fiscal year 2024, issued on February 26, 2025, the Company reported that it had instituted what it called a "Restructuring Plan" in the fourth quarter of 2024 "to improve our long-term profitability and cash flow generation, optimize the footprint of new store growth and lower our cost base." Doing so, it said, would "simplify our near-term growth strategy in order to build a stronger foundation from which to scale in the future, and to drive sustainable and disciplined growth, profitability and return on invested capital."

39. The primary focus of the Restructuring Plan, Grocery Outlet said, was to cut back on the pace of store openings. In its words: "We are optimizing new store growth in fiscal 2025 and fiscal 2026 to increase efficiencies for distribution and optimize brand awareness and marketing. Specifically, we are narrowing our focus in our future new store openings to target existing markets and a smaller set of high-priority adjacent new markets to improve new store sales productivity and return on invested capital." The Company thus terminated leases for at least 23 planned but unopened stores. Instead, it stated that it planned to open 33 to 35 new stores in existing markets, or high-priority new, but adjacent, markets.

40. A secondary focus of the Restructuring Plan was to cut down on capital-intensive projects. These were primarily related to warehouses and distribution infrastructure; the Company announced that it had "cancelled certain warehouse projects," and intended to "instead invest in lower cost distribution centers for dry goods."

41. A final focus of the Restructuring Plan was that which is included in so many restructuring plans: terminations. Grocery Outlet announced that it had "reduced headcount by approximately 40 full-time employees." The Company did not identify which roles or teams were subject to termination.

42. Taken together, the Company estimated the Restructuring Plan to cost between $52 and $61 million. The primary costs, it said, were related to the lease terminations: Between $30 and $37 million in cash expenses, alongside $9.2 million in non-cash impairment. Other costs involved non-cash impairment related to the cancelled warehouse projects ($6.7 million), severance and related costs ($1.6 million), and $4.5 to 6.5 million in professional fees.

43. Grocery Outlet said that it expected the Restructuring Plan "to be substantially completed by the first half of fiscal 2025." At the same time, it reaffirmed its commitment to long-term growth: "We believe that strategic new store growth remains a significant and critical driver of long-term stockholder value." It again stated that "our white space remains vast," this time envisioning the potential for 4,000 stores (down from 4,800 a year earlier). The Company's ability to fill this void, it said, was "demonstrated by the success of our stores across a broad range of geographies, population densities and demographic groups." These geographies were primarily split between the East and West Coasts, with 409 and 93 stores, respectively. Another 31 stores were somewhere in between.

44. On the earnings call corresponding to the release, an investor asked Lindberg—then serving as Chairman of the Board—whether "the restructuring plan cause[s] you to think differently about the right cadence of store openings and/or margin profile over the long term." Lindberg responded that it did not:

> I wouldn't say the restructuring plan made me think differently. I would say the execution of the business made me think about, we needed to do something different. To me, you have to address the sub-performance and we need to do

> something different than we were doing before. And when I talked in the last call, I talked about reducing the priorities, let's narrow down to the things we can execute well. We're going to start with value. We need to fill the leadership team.
>
> But in that was, look, we were going to try and open too many stores in too many new markets that did not have connections to adjacent markets. And that's really hard to do. You start with sort of four or five things that you need to be successful, market awareness, you need people power, meaning you got to be able to recruit them and train them and support them in region, you need some distribution and marketing synergies, and then you got to have the messaging that's going to hit in a market with lots and lots of stores. And we were not doing that.
>
> So that execution informed, I think the start of the look at the reorg and the real estate, then we can go a little deeper on supply chain, and then at home here for SG&A, we worked with some really talented outside folks on costs, and we made cuts where we're actually pulling back on priorities. So we sort of put the three of them together. That's the way we think about it.

45. The Company provided an update on the Restructuring Plan in May 2025, in its first quarterly report for that year. Grocery Outlet reported that it had decided to terminate leases for five additional stores, bringing the total to 28; these were what it called "unopened stores in suboptimal locations which we had planned to open in the next several years." It likewise reported that "[d]uring the first quarter of fiscal 2025, we cancelled certain warehouse projects." Costs to date came to slightly under $50 million; total anticipated costs were now $59 to $61 million. The Company reaffirmed that the Restructuring Plan was "expected to be substantially completed by the first half of fiscal 2025."

46. Beneath the veneer, however, the Restructuring Plan was not eliminating positions related to unopened stores: It was eliminating positions that were essential to new-store stability. According to CW3, the plan eliminated the New Store Set Team, which handled the physical setup of new locations. So too did it eliminate the New Store Support Team, which provided transitional help to owner-operators of new stores. Gone was the role of New Store Transition Coach, which previously provided guidance to owner-operators as they sought to navigate early operational challenges. Out was the East Coast Produce Buyer, who sourced local produce deals

that had been popular with customers; the remaining buyers were in California, and were unable to secure the same items a coast away. East Coast stores therefore lost access to strong regional produce pricing, and customer perception suffered.

47. Overall, CW3 said, the Restructuring Plan removed support systems that had served a clear purpose. The removal left operators struggling during a period when the Company needed more stability—not less. CW3 added that, while the Company assured investors that it was on track with restructuring, operators were navigating a different reality. And far from engaging with these issues during Grocery Outlet's periodic all-hands calls, Potter was a veritable ghost—off camera, with microphone muted.

**D. <u>2025: Grocery Outlet Finishes Restructuring And Touts Store Growth</u>**

48. On August 5, 2025, Grocery Outlet issued a press release announcing its financial results for the second quarter of that year, ending on June 28, 2025.

49. In the release, the Company announced that "[t]he actions under the Restructuring Plan were substantially completed in the second quarter of fiscal 2025." The total cost, it said, had been $63 million.

50. The Company also touted the effect of new stores on its bottom line. During the second quarter "[n]et sales increased 4.5% to $1.18 billion . . . due to new store sales," it said, noting that "[w]e opened 11 new stores and closed two stores, ending the quarter with 552 stores in 16 states." Similarly, it reported that during the first half of the year, "[n]et sales increased 6.5% to $2.31 billion . . . due to new store sales . . . . We opened 22 new stores and closed three stores."

51. The company again stated that it expected to continue expanding, providing outlook for a net addition of 33 to 35 new stores.

52. On an earnings call that day, the Company reiterated the same points. Potter added, too, that "[w]e also made important progress during the past quarter on [ ] four strategic imperatives," including "tackling new store performance." On that front, he said, "[w]e're taking deliberate steps to improve performance across our store base. We're rebalancing store growth towards a healthy mix of core versus new markets, adjusting our internal returns framework, developing more robust site selection criteria, and testing several key commercial pilots to drive our performance."

53. Potter also added that "[s]lowing down our store expansion will allow us to dial in the model to find the optimal level of sustainable unit growth that generates solid returns on invested capital."

54. The following day, on August 6, 2025, Grocery Outlet released its quarterly report. The Company reiterated that the Restructuring Plan was "substantially completed." It wrote that the plan would help "optimiz[e] new store growth in the next several years," and that, again, it planned "to open 33 to 35 net new stores in fiscal 2025."

55. The Company likewise reiterated its commitment to growth. "We expect new store growth to be a significant and critical driver of our net sales growth over the long term," it claimed. "Opening or, on a limited strategic basis, acquiring new stores is a primary component of our growth strategy and, as we continue to execute on our growth strategy, we expect that a significant portion of our net sales growth will be attributable to non-comparable store net sales."

**E. <u>2025–26: Unbeknownst To Investors, Grocery Outlet Knew That Stores Remained Unviable</u>**

56. Far from the Restructuring Plan having addressed the issues, however, Grocery Outlet's management knew, or disregarded signs, that many stores were neither profitable nor capable of becoming so. As CW3 said, the underlying inventory issues went unaddressed and unresolved. Monthly calls and reports showing the poor performance continued unabated; the

reports prepared as part of TCAP showed additional insight into those stores in particularly dire straits.

57. CW2 observed this firsthand as the Company declared the Restructuring Plan finished. A Senior Product Owner/Business Analyst who worked at Grocery Outlet from the beginning of 2025 to 2026, CW2 sat two seats below the CIO, who himself reported to the CEO. CW2's role, as part of a "scrum team" that interfaced with multiple departments, brought CW2 into contact with people in a wide array of roles. On regular meetings to discuss store performance, with leadership including the CIO, only a small number of stores were performing well; the meetings frequently highlighted the disparity between those few stores and the majority that were underperforming. CW2 called the meetings "uneven and often tense." Mishra's tenure as CIO was particularly erratic and difficult, with a leadership style frequently marked by yelling and pressure—by both him and his reports. The culture and environment, CW2 said, were "horrible."

58. As CW2 recalled, some store operators were given influence in the discussions, while others were entirely ignored. Calls to discuss store performance frequently focused on stores in California and Oregon, and ignored broader operational needs. It was open knowledge inside the Company, CW2 said, that certain locations were simply unable to sustain operations.

59. Within Grocery Outlet, CW3 added, knowledge was closely guarded; some people seemed aware of upcoming store closures, while others did not. CW3 said that the store operators themselves were amongst the last to know, and had no way to influence the decisions.

60. On March 4, 2026, ten minutes before Grocery Outlet's scheduled earnings call, CW3 received a call from Grocery Outlet. The caller read a scripted message stating that CW3's store would be closed, and asked to confirm that CW3 understood the message. The call with CW3 ended; the call with investors commenced.

61. On the earnings call, Grocery Outlet finally informed the public what it had long known: that it had expanded far too quickly and, after missing nearly every major financial metric, needed to close dozens of underperforming stores. While it had once boasted of "the success of our stores across a broad range of geographies," now, it admitted that in "places like the east, where we have much fewer stores, the network is relatively new. The experience of the team is obviously at a different place than it is in a place like California." The East, it admitted, was a place that it did not yet "understand." Under a new "Optimization Plan"—presumably so named because "Restructuring Plan" was already taken—the Company announced that it was closing dozen of stores, including *30%* of the Company's East Coast fleet.

## Materially False and Misleading Statements

62. During the Class Period of February 25, 2025, to March 4, 2026, Grocery Outlet made numerous false and misleading statements.

63. On February 25, 2025, Grocery Outlet issued a press release announcing its financial results for fiscal year 2024. The press release stated, amongst other things, that:

> **Highlights for Fourth Quarter Fiscal 2024 as compared to Fourth Quarter Fiscal 2023:**
>
> - Net sales increased by 10.9% to $1.10 billion.
>
> . . .
>
> **Highlights for Fiscal 2024 as compared to Fiscal 2023:**
>
> - Net sales increased by 10.1% to $4.37 billion.
>
> . . .
>
> "We delivered solid fourth quarter results, generating comps above expectations as customers responded to our improved value assortments," said Eric Lindberg, Chairman of the Board of Directors of Grocery Outlet. "We continue to make progress on multiple fronts, and we are keenly focused on key strategic initiatives that will strengthen our foundation and support future growth, while ensuring we deliver best in class execution for our customers and independent operators."

. . .

"I am honored to lead this unique and differentiated company as we embark on the next stage of our strategic roadmap," said Jason Potter, President and CEO of Grocery Outlet. "In my first few weeks, Eric and I have been working closely together and are aligned on the company's strategic direction to drive disciplined, sustainable growth and improve returns on capital."

. . .

**Fourth Quarter Fiscal 2024 Financial Summary**

Net sales increased 10.9% to $1.10 billion during the fourth quarter due to new store sales and a 2.9% increase in comparable store sales. . . . . The Company opened five new stores and closed one store, ending the quarter with 533 stores in 16 states.

. . .

**Fiscal 2024 Financial Summary**

Net sales increased by 10.1% to $4.37 billion during fiscal 2024 due to new store sales and a 2.7% increase in comparable store sales, driven by a 4.2% increase in the number of transactions . . . . The Company added 67 new stores, including 40 stores from the acquisition of United Grocery Outlet, and closed two stores during the year.

. . .

**Restructuring Plan:**

During the fourth quarter of fiscal 2024, the Company began to initiate a restructuring plan that is intended to improve long-term profitability and cash flow generation, optimize the footprint of new store growth and lower the Company's cost base (the "Restructuring Plan"). The Restructuring Plan includes (i) the termination of leases for unopened stores in suboptimal locations, (ii) the cancellation of certain capital-intensive warehouse projects and (iii) the implementation of a workforce reduction, pursuant to which the Company notified affected employees on February 18, 2025. These actions under the Restructuring Plan are expected to be substantially completed by the first half of fiscal 2025. The Company currently estimates that it will incur total costs under the Restructuring Plan of between $52 million and $61 million, of which between $36 million and $45 million are expected to be cash expenditures.

**Outlook:**

The Company is providing the following outlook for fiscal 2025:

| | |
|---|---|
| New store openings, net | 33 to 35 |
| Net sales | $4.7 billion to $4.8 billion |
| Comparable store sales increase[3] | 2.0% to 3.0% |
| Gross margin | 30.0%-30.5% |
| Adjusted EBITDA[1] | $260 million to $270 million |
| Adjusted diluted earnings per share[1] | $0.70 to $0.75 |
| Capital expenditures (net of tenant improvement allowances) | $210 million |

64. The foregoing statements were materially false and/or misleading, and failed to disclose material adverse facts about Grocery Outlet's business, operations, and prospects. Specifically, the Defendants failed to disclose to investors that: (1) the Company's rapid expansion into new and geographically dispersed markets had outpaced its operational infrastructure, personnel, and ability to support new stores; (2) the Company's purportedly strong sales growth was materially dependent on the continued addition of new stores, including stores in markets where Grocery Outlet lacked the experience, distribution support, brand recognition, and operational infrastructure necessary to achieve sustainable store-level performance; (3) the Company's recent store openings were experiencing substantial performance problems, including inadequate inventory, weak sales, and insufficient operator support; (4) Grocery Outlet's decision to terminate leases for unopened stores in "suboptimal locations" reflected broader deficiencies in its recent expansion strategy, including problems with site selection and the Company's ability to successfully operate stores in newer markets; (5) the Company's existing store fleet, particularly its newer and more geographically dispersed stores, was not performing consistently across the "broad range of geographies" touted by the Company; (6) the Company's newly announced Restructuring Plan was being undertaken in response to operational deficiencies associated with its prior expansion, but the Company had not identified or disclosed the full extent of those deficiencies to investors and instead framed the deficiencies as concerning future

expansion; (7) the workforce reduction contemplated by the Restructuring Plan would eliminate personnel and teams necessary to support new stores and their operators, thereby impairing rather than resolving certain of the operational problems associated with the Company's expansion; (8) the Company lacked a reasonable basis to represent that its store model was designed to generate robust store-level financial results and attractive returns across its expanding geographic footprint; and (9) as a result, the Defendants' representations concerning "disciplined, sustainable growth," the Company's store performance, and the ability of the Restructuring Plan to establish a stronger foundation for future expansion were materially misleading and lacked a reasonable basis.

65. The same day, Grocery Outlet held an earnings call with its shareholders. During the call, Defendant Lindberg stated:

> 2024 was a year in which many critical operational elements were out of sync, which was further exacerbated by trying to do too much too fast, but we're working urgently to get back on track.
>
> . . .
>
> As I mentioned previously, we were trying to do too much too fast. We implemented a major new system, we completed a significant acquisition that increased our store count materially, rapidly expanding into new markets, and we began executing on a capacity increasing supply chain initiative. We know we have a vast addressable market and tremendous long-term growth opportunities. To best take advantage, we need to simplify and take a more rigorous and disciplined approach to how we allocate incremental capital.
>
> With that in mind, we have been evaluating our recent new store openings, infrastructure and growth initiatives. This work is ongoing, but I wanted to share a few key areas that we're addressing. First, we are reassessing our new store opening strategy. We know that when we open a new store in an existing market where we have brand recognition and distribution support in close proximity, these stores typically ramp faster than a store in a less developed new market.
>
> For new markets, clustering openings and adjacency to existing markets is important for brand recognition, for marketing and for operational synergies, all of which contribute to how quickly a new store can ramp. As we looked at our opening schedule for the next two years, I saw that we were trying to open too many

> stores in too many new markets, which don't perform as well as existing markets or new adjacent markets. Thus, we are narrowing the focus in our future new store openings to target existing markets in small -- in a smaller set of high priority adjacent new markets, and that will help us improve new store sales productivity and return on invested capital.
>
> In addition, a more narrowed focus to new store openings will allow our infrastructure to more effectively support our expansion efforts. . . .
>
> When we last spoke, we had over 50 leases signed for 2025. As a result of our narrowed focus, we expect to open 33 to 35 net new stores in 2025, and exit leases with suboptimal locations, which Chris will discuss a little bit more in detail later. While we are tempering our near term unit growth expectations, I want to reiterate that we believe our whitespace remains vast with the potential to open over 4,000 stores across the United States.

66. On the same call, Defendant Potter, after being introduced as the new CEO, stated:

> As Eric has pointed out, while we have some near-term challenges related to systems implementation and new store performance, these challenges are actively being addressed and will be overcome. These challenges and opportunities are familiar territory for me as I've spearheaded multiple turnarounds across many grocery models. In each case, we were successful in driving sales, profitability and ultimately returns for all stakeholders by improving collaboration, execution and the customer experience.
>
> Earlier this month, I hit the ground running with the support of the GO Board. We are aligned on the core objective of delivering consistent and disciplined growth. I understand what it takes to lead and scale this business, and I look forward to working with the team, our independent operators, the Board and our suppliers to maximize the full potential of the Grocery Outlet.

67. Later on the call, an investor asked Lindberg whether "the restructuring plan cause[s] you to think differently about the right cadence of store openings and/or margin profile over the long term." Lindberg responded:

> I wouldn't say the restructuring plan made me think differently. I would say the execution of the business made me think about, we needed to do something different. To me, you have to address the sub-performance and we need to do something different than we were doing before. And when I talked in the last call, I talked about reducing the priorities, let's narrow down to the things we can execute well. We're going to start with value. We need to fill the leadership team.
>
> But in that was, look, we were going to try and open too many stores in too many new markets that did not have connections to adjacent markets. And that's really

> hard to do. You start with sort of four or five things that you need to be successful, market awareness, you need people power, meaning you got to be able to recruit them and train them and support them in region, you need some distribution and marketing synergies, and then you got to have the messaging that's going to hit in a market with lots and lots of stores. And we were not doing that.
>
> So that execution informed, I think the start of the look at the reorg and the real estate, then we can go a little deeper on supply chain, and then at home here for SG&A, we worked with some really talented outside folks on costs, and we made cuts where we're actually pulling back on priorities. So we sort of put the three of them together. That's the way we think about it.

68. The foregoing statements were materially false and/or misleading, and failed to disclose material adverse facts about Grocery Outlet's business, operations, and prospects. Specifically, the Defendants failed to disclose to investors that: (1) the Company had already expanded into too many markets too quickly relative to its operational capabilities and the experience of its personnel; (2) the problems associated with new-market expansion were not limited to future stores or isolated execution issues, but were already affecting stores that had been opened and were operating; (3) the Company's newer markets lacked the market awareness, personnel, distribution and marketing synergies, and operational support that Lindberg himself identified as necessary for successful new-store ramping; (4) Grocery Outlet's recent new-store cohort included stores that were underperforming and lacked a viable path to sustainable profitability; (5) the Company's management had information concerning poor store performance through recurring financial and operational reviews and therefore knew, or recklessly disregarded, the extent to which its expansion strategy was producing underperforming stores; (6) the problems with the Company's expansion were sufficiently serious that simply narrowing the number of future openings would not resolve the underlying operational deficiencies affecting the existing fleet; (7) despite Lindberg's pronouncements that the Restructuring Plan's cuts were "where we're actually pulling back on priorities," and that "people power" was necessary to recruit, train, and support stores in new regions, the Restructuring Plan would in fact eliminate personnel

responsible for supporting new stores and operators; (8) the Company's claimed ability to take advantage of a "vast" whitespace opportunity was materially undermined by the deficiencies in its existing expansion model; and (9) accordingly, the Defendants' assurances that the identified challenges were "actively being addressed and will be overcome" and that the Company was positioned for sustainable growth, were materially misleading and lacked a reasonable basis.

69. The next day, on February 26, 2025, Grocery Outlet released its annual report for the fiscal year ended December 28, 2024. In the report, the Company stated, amongst other things, that:

> **Our Stores and Expansion Opportunities**
>
> . . .
>
> We believe that strategic new store growth remains a significant and critical driver of long-term stockholder value. Additionally, we further believe our white space remains vast with the potential to operate over 4,000 stores across the United States, demonstrated by the success of our stores across a broad range of geographies, population densities and demographic groups. Our new store growth efforts remain focused on organic growth that align with our long-term geographic expansion and store growth strategies. Complementary growth opportunities include expanding strategic relationships with large property owners, evaluating opportunistic real estate lists, and exploring strategic regional acquisitions. We deploy a store model that is designed to generate robust store-level financial results, strong cash flow and attractive return. We have a dedicated real estate team that utilizes a rigorous site selection process in order to source new store locations that generate strong overall returns
>
> . . .
>
> ***Restructuring Plan.*** While we continue to believe in our long-term growth potential, we recently reviewed our strategic initiatives and priorities and have determined to simplify our near-term growth strategy in order to build a stronger foundation from which to scale in the future, and to drive sustainable and disciplined growth, profitability and return on invested capital. In particular, we reassessed our new store opening strategy for fiscal 2025 and fiscal 2026, the efficiency of certain supply chain investments and our general and administrative cost structure. As a result, during the fourth quarter of fiscal 2024, we began to initiate the Restructuring Plan that is intended to improve our long-term profitability and cash flow generation, optimize the footprint of new store growth and lower our cost base. As further discussed below, the Restructuring Plan

provides for (i) the termination of leases for unopened stores in suboptimal locations, 15 of which we had planned to open in fiscal 2025 and eight of which we had planned to open in fiscal 2026 (the "Lease Terminations"), (ii) the cancellation of certain capital intensive warehouse projects and (iii) the implementation of a workforce reduction, pursuant to which we notified affected employees on February 18, 2025 (the "Workforce Reduction"). These actions under the Restructuring Plan are expected to be substantially completed by the first half of fiscal 2025.

We currently estimate we will incur total costs under the Restructuring Plan of between $52 million and $61 million, of which between $36 million and $45 million are expected to be cash expenditures. The Restructuring Plan includes the activities set forth below:

- We are optimizing new store growth in fiscal 2025 and fiscal 2026 to increase efficiencies for distribution and optimize brand awareness and marketing. Specifically, we are narrowing our focus in our future new store openings to target existing markets and a smaller set of high-priority adjacent new markets to improve new store sales productivity and return on invested capital. We plan to open 33 to 35 net new stores in fiscal 2025 in existing markets and a smaller set of high-priority adjacent new markets. We incurred $9.2 million of non-cash impairment of long-lived assets in the fourth quarter of fiscal 2024 related to the Lease Terminations, which is included in selling, general and administrative expenses. We estimate that we will incur between $30 million to $37 million of additional cash expense related to the Lease Terminations in the first half of fiscal 2025.

- We are shifting our planned investments in our distribution infrastructure in fiscal 2025 and fiscal 2026 away from highly capital-intensive projects. We will instead invest in lower cost distribution centers for dry goods to enhance capacity and improve inventory management and overall execution. In connection with such strategy, we cancelled certain warehouse projects, resulting in $6.7 million of non-cash impairment of long-lived assets in the fourth quarter of fiscal 2024, which is included in selling, general and administrative expenses.

- We are building a more scalable cost structure through the implementation of the Workforce Reduction, which reduced headcount by approximately 40 full-time employees in the first quarter of fiscal 2025 with total cash cost incurred of $1.6 million, including employee severance, employee benefit and related costs.

- In connection with the Restructuring Plan, we estimate that we will incur cash costs of between $4.5 million and $6.5 million in legal and other professional fees in the first half of fiscal 2025

> ***New Store Growth.*** Planned construction and opening of new stores has been, and may continue to be, negatively impacted due to both increased lead times to acquire materials, obtain permits and licenses, hook up utilities as well as higher construction and development related costs. Our new store growth efforts are focused on organic growth combined with complementary real estate opportunities that align with our long-term geographic expansion and store growth strategies. Complementary growth opportunities may include expanding strategic relationships with large property owners, evaluating acquisitions of opportunistic real estate that become available through consolidation in the retail sector, and exploring strategic regional acquisitions of operating businesses. On April 1, 2024, we acquired United Grocery Outlet, which included 40 stores in six adjacent states we did not operate in as of such date (Tennessee, North Carolina, Georgia, Alabama, Kentucky and Virginia) and a company-operated distribution center. The acquisition provides us with the opportunity to scale in a new region and is a platform for potential future expansion in the Southeast. Excluding the United Grocery Outlet transaction, we opened 27 new stores and closed two stores during fiscal 2024. Our near-term integration focus is expanding the assortment, investing in store refreshes and new fixtures and introducing some of our marketing programs to the Southeast region. We plan to open 33 to 35 net new stores in fiscal 2025.

70. The foregoing statements were materially false and/or misleading, and failed to disclose material adverse facts about Grocery Outlet's business, operations, and prospects. Specifically, the Defendants failed to disclose to investors that: (1) the Company's prior geographic expansion had materially exceeded its ability to provide the personnel, distribution infrastructure, operator support, and market expertise necessary to operate new stores successfully; (2) despite the Company's assertion that its stores had demonstrated success across a "broad range of geographies, population densities and demographic groups," performance varied substantially by market and the Company's newer markets, particularly along the East Coast, were experiencing substantial operational and financial deficiencies; (3) the Company's site-selection and expansion processes had resulted in stores being opened in locations that were not capable of generating the returns management had projected; (4) the Company's statement that it employed a "rigorous site selection process" that generated strong overall returns was misleading because the Company was experiencing material problems with the locations and performance of recently opened stores, including as a result of poor site selection; (5) the

Company's stated strategy of using new-store growth as a "significant and critical driver of long-term stockholder value" was misleading because the Company's growth in sales was increasingly dependent upon adding stores whose performance and profitability were materially weaker than investors had been led to believe; (6) the Company's decision to terminate leases for 23 unopened stores was not merely an effort to "optimize" the timing and location of future growth, but was part of a broader correction of deficiencies in the Company's expansion strategy; (7) the Company had not disclosed the extent to which its existing stores and newer markets required additional operational support, notwithstanding its representation that it was building a stronger foundation from which to scale; (8) the workforce reduction would affect functions supporting store openings and operators, thereby creating additional risks that the Restructuring Plan purported to improve; and (9) the Company therefore lacked a reasonable basis for its representations concerning sustainable and disciplined growth, attractive store-level returns, and its ability to expand successfully into its purportedly vast remaining whitespace.

71. On May 6, 2025, Grocery Outlet issued a press release announcing its financial results for the first quarter of that year, ending on March 29, 2025. The press release stated, amongst other things, that:

> **Highlights for First Quarter Fiscal 2025 as compared to First Quarter Fiscal 2024:**
>
> - Net sales increased by 8.5% to $1.13 billion.
>
> . . .
>
> "We delivered solid first quarter results, with comp-store sales and gross margins slightly ahead of our outlook, driven by traffic growth and tighter inventory management," said Jason Potter, President and CEO of Grocery Outlet. "We are encouraged by the improvement in our margins and the progress we have made on our real-time order guide."
>
> Mr. Potter continued, "I'm very confident about the long-term potential of Grocery Outlet. Our model remains highly differentiated and our performance should

continue to accelerate as we improve our level of execution. . . . Our vision is to become one of the country's most-loved brands and the foundational work we are currently undertaking should enable us to achieve that goal while driving significant shareholder value through strong top-line growth and improved profitability."

. . .

**First Quarter Fiscal 2025 Financial Summary**

Net sales increased 8.5% to $1.13 billion during the first quarter due to new store sales, including the United Grocery Outlet stores acquired in the prior year, and a 0.3% increase in comparable store sales . . . . We opened 11 new stores and closed 1 store, ending the quarter with 543 stores in 16 states.

. . .

**Restructuring Plan**

The Company initiated a restructuring plan during the fourth quarter of fiscal 2024, with continuing implementation in fiscal 2025, intended to improve long-term profitability, cash flow generation and return on invested capital, optimize the footprint of new store growth and lower the Company's cost base (the "Restructuring Plan"). The Restructuring Plan includes (i) the termination of a total of 28 leases for unopened stores in suboptimal locations, as expanded in scope by five additional stores from the 23 stores determined as of fiscal 2024, (ii) the cancellation of certain capital-intensive warehouse projects and (iii) a reduction in headcount in building a more scalable cost structure. As of March 29, 2025, the Company estimates that it will incur total costs under the Restructuring Plan of between $59 million and $61 million, of which between $40 million and $42 million are expected to be cash expenditures. All costs incurred during the first quarter are included in Restructuring charges on the condensed consolidated statements of operations and comprehensive income (loss). The actions under the Restructuring Plan are expected to be substantially completed by the first half of fiscal 2025.

72. The foregoing statements were materially false and/or misleading, and failed to disclose material adverse facts about Grocery Outlet's business, operations, and prospects. Specifically, the Defendants failed to disclose to investors that: (1) the Company's first-quarter sales growth remained materially dependent on the addition of new stores rather than reflecting broad-based strength across the existing fleet; (2) many existing and recently opened stores continued to experience operational deficiencies and weak performance notwithstanding the

Company's assertion that it was making progress in execution; (3) the Restructuring Plan had not resolved the Company's underlying inventory and store-support problems; (4) the Company's decision to terminate 28 leases for unopened stores in "suboptimal locations" reflected broader deficiencies in its prior expansion and site-selection strategy; (5) the approximately 40 employees the Company had eliminated as part of the Restructuring Plan included personnel and teams responsible for setting up, supporting, and transitioning new stores; (6) those workforce reductions impaired the Company's ability to provide the operational support necessary for successful new-store ramping, particularly in newer markets; (7) the Company lacked a reasonable basis to represent that its model remained capable of accelerating performance and generating substantial shareholder value through continued top-line growth and improved profitability; and (8) the Defendants' representations that the "foundational work" then being undertaken would enable the Company to achieve its stated objectives were materially misleading because material operational deficiencies remained unresolved.

73. The same day, Grocery Outlet held an earnings call with its shareholders. During the call, Defendant Potter stated:

> Achieving our potential . . . requires . . . focused execution. With that as a context, we're pursuing four important strategic imperatives. . . .
>
> The first is tackling our new store performance to drive long-term growth and strengthen returns on invested capital. . . . We're carefully calibrating our approach to grow to ensure we have the winning conditions in place before expanding more aggressively. We are in the process of piloting a new commercial execution playbook to drive year one sales at a higher starting point. We're also clustering stores in new markets and calibrating our mix of new stores to incorporate approximately 50% infill in markets where our brand awareness is high. This is going to continue into 2026, during which we plan to open between 30 and 35 net new stores.
>
> Second, another critical component of our future success is securing top talent. Our talented new CIO, Kumar Mishra, has gotten right to work in just a few months into the role. He's already made significant progress getting our systems integration on the right track.

74. Later on the same call, Defendant Miller stated:

> Net sales increased 8.5% to $1.13 billion, driven by a combination of new stores opened in the last 12 months, the addition of UGO in April last year, as well as 30 basis point increase in comparable store sales. . . . . During the first quarter, we opened 11 new stores and closed one store, putting us on track to achieve our annual target for 33 to 35 net new stores for the year. We ended the first quarter with 543 stores in 16 states.

75. The foregoing statements were materially false and/or misleading, and failed to disclose material adverse facts about Grocery Outlet's business, operations, and prospects. Specifically, the Defendants failed to disclose to investors that: (1) the Company's efforts at "tackling our new store performance" were being undertaken against a backdrop of widespread underperformance amongst existing stores, rather than merely as preventative measures for future expansion; (2) the Company's new-store performance problems were particularly acute in newer geographic markets where Grocery Outlet lacked the operational experience and infrastructure necessary to support stores; (3) the Company's proposed "commercial execution playbook," clustering strategy, and revised store mix had not yet addressed the underlying deficiencies affecting stores already in operation; (4) the Company's continued plan to open 30 to 35 stores in 2026 was inconsistent with the severity and persistence of the operational problems management was purportedly addressing; (5) the Company's recurring store-performance reviews and other internal monitoring provided management with information concerning underperforming stores that contradicted the optimistic characterization of its new-store performance; (6) the Company's workforce reductions had eliminated functions that were directly responsible for supporting new stores and independent operators; (7) the Company's ability to generate attractive returns from continued expansion was therefore materially more uncertain and unlikely than the Defendants represented; and (8) the Defendants' statements that the Company was "carefully calibrating our approach to grow" and had the conditions necessary for continued expansion were materially

misleading because management had not disclosed the extent of the existing store-performance deficiencies or the operational support gaps created by the Restructuring Plan.

76. The next day, on May 7, 2025, Grocery Outlet released its quarterly report for the fiscal quarter ended March 29, 2025. In the report, the Company stated, amongst other things, that:

> Key financial and operating performance results for the first quarter of fiscal 2025 compared to the first quarter of fiscal 2024 were as follows:
>
> - Net sales increased 8.5% to $1.13 billion from $1.04 billion in the first quarter of fiscal 2024.
>
> . . .
>
> The increase in net sales was primarily attributable to an increase in non-comparable store net sales growth primarily from the 69 net new stores acquired or opened over the last 12 months as well as comparable store sales
>
> . . .
>
> ***Restructuring Plan.*** While we continue to believe in our long-term growth potential, we reviewed our strategic initiatives and priorities in late fiscal 2024 and determined to simplify our near-term growth strategy in order to build a stronger foundation from which to scale in the future and to drive sustainable and disciplined growth. As a result, we initiated a restructuring plan during the fourth quarter of fiscal 2024, with continuing implementation in fiscal 2025, intended to improve our long-term profitability, cash flow generation and return on invested capital, optimize the footprint of new store growth, and lower our cost base (the "Restructuring Plan").
>
> The Restructuring Plan includes the activities set forth below:
>
> - We are optimizing new store growth in the next several years to increase efficiencies for distribution and optimize brand awareness and marketing. Specifically, we have narrowed our focus on our future new store openings to target existing markets and a smaller set of high priority adjacent new markets to improve new store sales productivity and return on invested capital. As such we have determined to terminate a total of 28 leases for unopened stores in suboptimal locations which we had planned to open in the next several years, as expanded in scope by five additional stores from the 23 stores determined as of fiscal 2024. We plan to open 33 to 35 net new stores in fiscal 2025 in existing markets and a smaller set of high-priority adjacent new markets.

- We have shifted our planned investments in our distribution infrastructure in fiscal 2025 and fiscal 2026 away from highly capital-intensive projects. We have instead, and plan to continue to, invest in lower cost distribution centers for dry goods to enhance capacity and improve inventory management and overall execution. During the first quarter of fiscal 2025, we cancelled certain warehouse projects in connection with such strategy.

- We are building a more scalable cost structure. We reduced headcount by approximately 40 full-time employees in the first quarter of fiscal 2025.

As of March 29, 2025, we estimate that we will incur total costs under the Restructuring Plan of between $59 million and $61 million, of which between $40 million and $42 million are expected to be cash expenditures. The estimated total costs include cumulative costs incurred of $49.8 million since the initiation of the Restructuring Plan, of which $33.9 million was incurred in the first quarter of fiscal 2025. All costs incurred in the first quarter of fiscal 2025 are included in Restructuring charges on the condensed consolidated statements of operations and comprehensive income (loss). The actions under the Restructuring Plan are expected to be substantially completed by the first half of fiscal 2025.

. . .

***New Store Growth.*** Planned construction and opening of new stores has been, and may continue to be, negatively impacted due to both increased lead times to acquire materials, obtain permits and licenses, hook up utilities as well as higher construction and development related costs. Recently implemented and proposed tariffs could further impact our constructions costs.

Our new store growth efforts are focused on organic growth combined with complementary real estate opportunities that align with our long-term geographic expansion and store growth strategies. Complementary growth opportunities may include expanding strategic relationships with large property owners, evaluating acquisitions of opportunistic real estate that become available through consolidation in the retail sector, and exploring strategic regional acquisitions of operating businesses. On April 1, 2024, we acquired The Bargain Barn, Inc., a Tennessee corporation doing business as United Grocery Outlet ("United Grocery Outlet"), which included 40 stores in six adjacent states we did not operate in as of such date (Tennessee, North Carolina, Georgia, Alabama, Kentucky and Virginia) and a company-operated distribution center. The acquisition provides us with the opportunity to scale in a new region and is a platform for potential future expansion in the Southeast. Our near-term integration focus is expanding the assortment, investing in store refreshes and new fixtures and introducing some of our marketing programs to the Southeast region. We opened 11 stores and closed 1 store in the first quarter of fiscal 2025 and plan to open 33 to 35 net new stores in fiscal 2025.

77. The foregoing statements were materially false and/or misleading, and failed to disclose material adverse facts about Grocery Outlet's business, operations, and prospects. Specifically, the Defendants failed to disclose to investors that: (1) the Company's dependence on non-comparable store sales from stores opened or acquired during the preceding year to increase its net sales masked weaknesses in the growth of its fleet; (2) the Company's decision to terminate 28 leases for unopened stores reflected deficiencies in the Company's recent expansion strategy that extended beyond the particular sites identified as "suboptimal"; (3) the Company continued to experience material deficiencies in new-store performance and operational execution notwithstanding its purportedly completed restructuring measures; (4) the workforce reduction had eliminated personnel responsible for supporting new stores and independent operators, creating additional risks to new-store productivity and returns; (5) the Company's distribution, inventory-management, and store-support infrastructure remained insufficient to support the pace of expansion contemplated by its guidance; (6) the Company's stated intention to continue opening 33 to 35 stores in fiscal 2025 was therefore not supported by adequate information concerning the viability and profitability of its existing expansion footprint; (7) the Company's representation that its Southeast expansion through United Grocery Outlet provided a platform for future growth failed to disclose the operational and market-specific challenges associated with expanding into newer regions; and (8) as a result, the Defendants lacked a reasonable basis for representing that the Restructuring Plan was building a stronger foundation for sustainable and disciplined growth and improved return on invested capital.

78. On August 5, 2025, Grocery Outlet issued a press release announcing its financial results for the second quarter of that year, ending on June 28, 2025. The press release stated, amongst other things, that:

**Highlights for Second Quarter Fiscal 2025 as compared to Second Quarter Fiscal 2024:**

- Net sales increased by 4.5% to $1.18 billion.

. . .

"Our focus on execution is beginning to deliver results, enabling us to outperform our outlook for the second quarter," said Jason Potter, President and CEO of Grocery Outlet. "Our resonant value proposition and store initiatives continued to drive growth in traffic, while our margin drivers and spending discipline are yielding sustainable gains in profitability. We also achieved important progress against the key strategic objectives we outlined last quarter. By continuing to strengthen new-store performance, secure top talent, address execution gaps, and improve execution at scale, we will create lasting value for our customers, independent operators, and shareholders."

**Second Quarter Fiscal 2025 Financial Summary**

Net sales increased 4.5% to $1.18 billion during the second quarter due to new store sales and a 1.1% increase in comparable store sales . . . . We opened 11 new stores and closed two stores, ending the quarter with 552 stores in 16 states.

. . .

**26 Weeks Ended June 28, 2025 Financial Summary**

Net sales increased 6.5% to $2.31 billion during the first half due to new store sales, including the United Grocery Outlet stores acquired in the prior year, and a 0.7% increase in comparable store sales. . . . . We opened 22 new stores and closed three stores.

. . .

**Restructuring Plan:**

The Company initiated a restructuring plan during the fourth quarter of fiscal 2024, with continuing implementation in fiscal 2025, intended to improve long-term profitability, cash flow generation and return on invested capital, optimize the footprint of new store growth and lower the Company's cost base (the "Restructuring Plan"). The Restructuring Plan includes (i) the termination of a total of 28 leases for unopened stores in suboptimal locations and the discontinued development of certain future store sites where we had incurred initial costs, but leases had not yet been signed, (ii) the cancellation of certain capital-intensive warehouse projects and (iii) a reduction in headcount in building a more scalable cost structure. As of June 28, 2025, the Company estimates that it will incur total costs under the Restructuring Plan of approximately $63 million, of which

approximately $39 million is expected to be cash expenditures. All costs incurred during the second quarter and first half of fiscal 2025 are included in Restructuring charges on the condensed consolidated statements of operations and comprehensive income (loss). The actions under the Restructuring Plan were substantially completed in the second quarter of fiscal 2025.

**Outlook:**

The Company is maintaining key guidance figures for fiscal 2025, other than diluted adjusted earnings per share which are updated as shown in the current guidance as follows:

| | Previous | Current |
|---|---|---|
| New store openings, net | 33 to 35 | 33 to 35 |
| Net sales | $4.7 billion to $4.8 billion | $4.7 billion to $4.8 billion |
| Comparable store sales increase[3] | 1.0% to 2.0% | 1.0% to 2.0% |
| Gross margin | 30.0%-30.5% | 30.0%-30.5% |
| Adjusted EBITDA[1] | $260 million to $270 million | $260 million to $270 million |
| Diluted adjusted earnings per share[1] | $0.70 to $0.75 | $0.75 to $0.80 |
| Capital expenditures (net of tenant improvement allowances) | $210 million | $210 million |

79. The foregoing statements were materially false and/or misleading, and failed to disclose material adverse facts about Grocery Outlet's business, operations, and prospects. Specifically, the Defendants failed to disclose to investors that: (1) the Company's reported sales growth continued to depend substantially on new-store sales, even as the Company had not resolved material deficiencies affecting the performance of its new and existing stores; (2) the Company's purported progress in "execution" and "new-store performance" did not reflect the continuing underperformance of a substantial portion of its store fleet; (3) the Company's stated efforts to "secure top talent, address execution gaps, and improve execution at scale" were necessary because material operational deficiencies remained throughout the store network; (4) the Restructuring Plan had not remedied the underlying problems associated with the Company's prior expansion strategy; (5) the Company had eliminated personnel responsible for new-store setup, support, and transition as part of the Restructuring Plan, despite continuing to rely on new stores as a principal driver of sales growth; (6) the Company's plan to continue opening 33 to 35 net new stores was being pursued notwithstanding unresolved problems concerning store

productivity and return on invested capital; (7) the Company's representations concerning the effectiveness of its new-store strategy and its ability to generate sustainable gains in profitability lacked a reasonable basis; and (8) the Defendants' characterization of the Restructuring Plan as substantially completed was materially misleading because the Company continued to face material operational deficiencies that would later require a separate, substantially more consequential intervention.

80. The same day, Grocery Outlet held an earnings call with its shareholders. During the call, Defendant Potter stated:

> We also grew comp store sales 1.1% from last year in line with our guidance and opened nine net new stores, keeping us on pace to achieve our 33 to 35 annual store opening target for this year.
>
> . . .
>
> We also made important progress during the past quarter on the four strategic imperatives we outlined on our last update. . . .
>
> First, tackling new store performance. We're taking deliberate steps to improve performance across our store base. We're rebalancing store growth towards a healthy mix of core versus new markets, adjusting our internal returns framework, developing more robust site selection criteria, and testing several key commercial pilots to drive our performance. Our pilots have included improving our merchandizing, enhancing our IO support, and adjusting and experimenting with marketing to tell our brand story. These efforts have contributed to our 2025 cohort of new stores performing ahead of plan on a year-to-date basis.

81. Later on the same call, Defendant Miller stated:

> Net sales increased 4.5% to $1.18 billion driven by a combination of new stores opened in the last 12 months and a 1.1% increase in comparable store sales in the second quarter. Comp growth was driven by a 1.5% increase in transactions partially offset by a 0.4% decrease in average transaction size.
>
> We continue to make progress on driving in stocks on everyday items and increasing our mix of opportunistic offerings, all of which are showing initial signs of contributing to comps. In the second quarter, we opened 11 new stores and closed two stores. We remain on track to deliver our annual target for 33 to 35 net new stores for the year, and we ended the second quarter with 552 stores in 16 states.

. . .

The actions under the restructuring plan are now substantially complete.

. . .

In closing, we have a tremendous opportunity and ample white space in front of us.

82. The foregoing statements were materially false and/or misleading, and failed to disclose material adverse facts about Grocery Outlet's business, operations, and prospects. Specifically, the Defendants failed to disclose to investors that: (1) the Company's continued opening of new stores was contributing to reported sales growth while masking persistent deficiencies in the performance of portions of the existing store fleet; (2) the Company's assertion that it "made important progress" on "tackling new store performance" was materially misleading because many stores continued to suffer from poor operating performance and inadequate support; (3) the Company's claims that it was improving inventory availability and store execution did not disclose the continuing store-level deficiencies identified through its internal performance monitoring; (4) the Company's "2025 cohort of new stores" had not been demonstrated to possess sustainable performance sufficient to justify the Company's continued expansion plans; (5) the Company's decision to continue targeting 33 to 35 net new stores reflected an expansion strategy that remained dependent upon new-store productivity that was belied by the performance of the existing fleet; (6) Miller's statement that the Company had a "tremendous opportunity and ample white space in front of us" failed to disclose the material operational and geographic limitations that had already undermined its prior expansion; (7) the Defendants' characterization of the Restructuring Plan as substantially complete was materially misleading because the Company continued to face material operational deficiencies that would later require a separate, substantially more consequential intervention; and (8) the Defendants'

repeated assurances concerning improved execution and new-store performance were materially misleading because they omitted material information concerning the continuing inability of certain stores and markets to achieve sustainable profitability.

83. The next day, on August 6, 2025, Grocery Outlet released its quarterly report for the fiscal quarter ended June 28, 2025. In the report, the Company stated, amongst other things, that:

> Key financial and operating performance results for the second quarter of fiscal 2025 compared to the second quarter of fiscal 2024 were as follows:
>
> - Net sales increased 4.5% to $1.18 billion from $1.13 billion in the second quarter of fiscal 2024.
>
> . . .
>
> The increases in net sales for the 13 and 26 weeks ended June 28, 2025 were primarily attributable to the addition of 28 net new stores opened over the last 12 months as well as an increase in comparable store sales.
>
> . . .
>
> ***Restructuring Plan.*** While we continue to believe in our long-term growth potential, we reviewed our strategic initiatives and priorities in late fiscal 2024 and determined to simplify our near-term growth strategy in order to build a stronger foundation from which to scale in the future and to drive sustainable and disciplined growth. As a result, we initiated a restructuring plan during the fourth quarter of fiscal 2024, with continuing implementation in fiscal 2025, intended to improve our long-term profitability, cash flow generation and return on invested capital, optimize the footprint of new store growth, and lower our cost base (the "Restructuring Plan"). The Restructuring Plan includes the activities set forth below:
>
> - We are optimizing new store growth in the next several years to increase efficiencies for distribution and optimize brand awareness and marketing. Specifically, we have narrowed our focus on our future new store openings to target existing markets and a smaller set of high priority adjacent new markets to improve new store sales productivity and return on invested capital. As such we have determined to terminate a total of 28 leases for unopened stores in suboptimal locations which we had planned to open in the next several years and to discontinue development of certain future store sites where we had incurred initial costs, but leases had not yet been signed.

We plan to open 33 to 35 net new stores in fiscal 2025 in existing markets and a smaller set of high-priority adjacent new markets.

- We have shifted our planned investments in our distribution infrastructure in fiscal 2025 and fiscal 2026 away from highly capital-intensive projects. We have instead, and plan to continue to, invest in lower cost distribution centers for dry goods to enhance capacity and improve inventory management and overall execution. During the first quarter of fiscal 2025, we cancelled certain warehouse projects in connection with such strategy.

- We are building a more scalable cost structure. We reduced headcount by approximately 40 full-time employees in the first quarter of fiscal 2025.

As of June 28, 2025, we estimate that we will incur total costs under the Restructuring Plan of approximately $63 million, of which approximately $39 million is expected to be cash expenditures. The estimated total costs include cumulative costs incurred of $60.9 million since the initiation of the Restructuring Plan, of which $11.2 million and $45.0 million was incurred in the second quarter and first half of fiscal 2025, respectively. All costs incurred in the second quarter and first half of fiscal 2025 are included in Restructuring charges on the condensed consolidated statements of operations and comprehensive income (loss). The actions under the Restructuring Plan were substantially completed in the second quarter of fiscal 2025.

. . .

***New Store Growth.*** Planned construction and opening of new stores has been, and may continue to be, negatively impacted due to both increased lead times to acquire materials, obtain permits and licenses, hook up utilities as well as higher construction and development related costs. Recently implemented and proposed tariffs could further impact our constructions costs. Our new store growth efforts are focused on organic growth combined with complementary real estate opportunities that align with our long-term geographic expansion and store growth strategies. Complementary growth opportunities may include expanding strategic relationships with large property owners, evaluating acquisitions of opportunistic real estate that become available through consolidation in the retail sector, and exploring strategic regional acquisitions of operating businesses. On April 1, 2024, we acquired The Bargain Barn, Inc., a Tennessee corporation doing business as United Grocery Outlet ("United Grocery Outlet"), which included 40 stores in six adjacent states we did not operate in as of such date (Tennessee, North Carolina, Georgia, Alabama, Kentucky and Virginia) and a company-operated distribution center. The acquisition provides us with the opportunity to scale in a new region and is a platform for potential future expansion in the Southeast. Our near-term integration focus is expanding the assortment, investing in store refreshes and new fixtures and introducing some of our marketing programs to the Southeast region. We opened 22 stores and closed 3 stores in the first half of fiscal 2025 and plan to open 33 to 35 net new stores in fiscal 2025.

84. The foregoing statements were materially false and/or misleading, and failed to disclose material adverse facts about Grocery Outlet's business, operations, and prospects. Specifically, the Defendants failed to disclose to investors that: (1) the increase in net sales attributable to stores opened during the preceding 12 months masked the unsustainability of the Company's expansion strategy as it related to store-level profitability; (2) the Company continued to experience substantial performance problems amongst existing and recently opened stores; (3) the Company's stated strategy of optimizing new-store growth did not address material deficiencies affecting stores already operating within the fleet; (4) the Restructuring Plan's elimination of personnel supporting new stores and independent operators had impaired the Company's ability to provide the support necessary to improve new-store performance; (5) the Company's "plan to open 33 to 35 net new stores in fiscal 2025" was inconsistent with the extent of the unresolved operational problems affecting the store fleet; (6) the Company's statements concerning its long-term geographic expansion strategy and its ability to use the United Grocery Outlet acquisition as a platform for further Southeast expansion failed to disclose the particular challenges associated with operating in newer markets; and (7) accordingly, the Defendants lacked a reasonable basis for representing that the Restructuring Plan had substantially addressed the Company's expansion-related deficiencies or that continued new-store growth would generate the sustainable profitability and returns that investors had been led to expect.

85. On November 4, 2025, Grocery Outlet issued a press release announcing its financial results for the third quarter of that year, ending on September 27, 2025. The press release stated, amongst other things, that:

> **Highlights for Third Quarter Fiscal 2025 as compared to Third Quarter Fiscal 2024:**
>
> - Net sales increased by 5.4% to $1.17 billion.

. . .

"In the third quarter, we made progress on our key initiatives while delivering strong bottom-line results. In addition, we launched our store refresh program at an initial group of pilot stores," said Jason Potter, President and CEO of Grocery Outlet. "By improving our store layouts, expanding our core assortment, elevating our value messaging, and providing IOs with enhanced tools, training and support, the pilot stores in the refresh program are seeing impressive results. We plan to expand the refresh program with a broad rollout starting in the fourth quarter. While same store sales growth did not meet our expectations in the third quarter, we believe these efforts, together with the exceptional talent we've added to our team and improved tools for IOs, position us well to accelerate same store sales growth in 2026."

**Third Quarter Fiscal 2025 Financial Summary**

Net sales increased 5.4% versus last year to $1.17 billion due to new store sales and a 1.2% increase in comparable store sales. . . . We opened 13 new stores and closed two stores, ending the quarter with 563 stores in 16 states.

. . .

**39 Weeks Ended September 27, 2025 Financial Summary**

Net sales increased 6.1% to $3.47 billion during the first three quarters due to new store sales and a 0.9% increase in comparable store sales. . . . We opened 35 new stores and closed five stores.

. . .

**Restructuring Plan:**

As previously reported, the Company initiated a restructuring plan during the fourth quarter of fiscal 2024, with continued implementation in fiscal 2025, intended to improve long-term profitability, cash flow generation and return on invested capital, optimize the footprint of new store growth and lower the Company's cost base (the "Restructuring Plan"). The Restructuring Plan included (i) the termination of a total of 28 leases for unopened stores in suboptimal locations and the discontinued development of certain future store sites where we had incurred initial costs, but leases had not yet been signed, (ii) the cancellation of certain capital-intensive warehouse projects and (iii) a reduction in headcount in building a more scalable cost structure. As of September 27, 2025, the Company incurred total costs under the Restructuring Plan of $62 million, of which $38 million were cash expenditures. All costs incurred during the third quarter and first three quarters of fiscal 2025 are included in Restructuring charges on the condensed

consolidated statements of operations and comprehensive income (loss). The actions under the Restructuring Plan were substantially completed in the second quarter of fiscal 2025.

**Outlook:**

The Company has revised key guidance figures for fiscal 2025 as shown in the current guidance as follows:

| | Previous | Current |
|---|---|---|
| New store openings, net | 33 to 35 | 37 |
| Net sales | $4.7 billion to $4.8 billion | $4.70 billion to $4.72 billion |
| Comparable store sales increase[3] | 1.0% to 2.0% | 0.6% to 0.9% |
| Gross margin | 30.0%-30.5% | 30.3%-30.4% |
| Adjusted EBITDA[1] | $260 million to $270 million | $258 million to $262 million |
| Diluted adjusted earnings per share[1] | $0.75 to $0.80 | $0.78 to $0.80 |
| Capital expenditures (net of tenant improvement allowances) | $210 million | $210 million |

86. The foregoing statements were materially false and/or misleading, and failed to disclose material adverse facts about Grocery Outlet's business, operations, and prospects. Specifically, the Defendants failed to disclose to investors that: (1) notwithstanding their repeated representations that the Company's 2025 new-store cohort was performing ahead of plan, material portions of the Company's store fleet remained underperforming and lacked a viable path to sustained profitability; (2) the Company's continued sales growth from new stores masked store-level profitability concerns that did not justify continued expansion; (3) the Company's decision to continue expanding its store base was being made while management possessed information indicating that certain existing stores and markets were not economically viable; (4) the Company's statements that it was positioned to "accelerate" comparable-store sales growth in 2026 were materially misleading because they failed to disclose the extent of the underperformance within the existing fleet; (5) the Company's continued representation of substantial opportunity for additional expansion failed to disclose that its prior expansion into newer markets had produced material operational and financial problems; and (6) the Defendants therefore lacked a reasonable basis for representing that the Company's strategic initiatives had

positioned it to achieve sustainable growth and improved profitability without substantial additional corrective action.

87. The same day, Grocery Outlet held an earnings call with its shareholders. During the call, Defendant Potter stated that "[o]n the new store front, our strategy continues to progress in the manner I outlined on our previous call and the performance of our '25 cohort remains ahead of plan."

88. On the same call, Defendant Miller stated that "[n]et sales increased 5.4% to $1.17 billion, propelled by 11 net new stores and a 1.2% increase in comparable store sales. In the third quarter, we opened 13 new stores and closed two stores, enabling us to increase our targeted openings to 37 net new stores for the year. We ended the third quarter with 563 stores across 16 states."

89. When asked by a shareholder "[h]ow should we think about new stores for next year," Defendant Potter responded that he anticipated "a range of 30 to 35 net new for next year."

90. The foregoing statements were materially false and/or misleading, and failed to disclose material adverse facts about Grocery Outlet's business, operations, and prospects. Specifically, the Defendants failed to disclose to investors that: (1) the Company's assertion that "the performance of our '25 cohort remains ahead of plan" did not reflect the performance of the broader store fleet, including stores that were materially underperforming; (2) the Company's ability to "increase our targeted openings to 37 net new stores for the year" masked the fact that its expansion strategy was producing unsustainable returns; (3) management was already aware of substantial operational and financial deficiencies amongst portions of the store fleet, including stores in newer geographic markets; (4) the Company's target of opening 30 to 35 stores in 2026 was being formulated despite the unresolved deficiencies associated with prior expansion; (5) the Company's strategy of continuing to expand into newer markets was materially constrained by

its lack of market-specific experience, personnel, and operational infrastructure; (6) the Company's purported progress on new-store performance did not disclose that certain stores were not financially viable and would ultimately require closure; and (7) the Defendants' statements concerning the Company's continued expansion and the performance of its new-store cohort were therefore materially misleading because they omitted material information concerning the deteriorating condition of the broader store fleet and the increasingly limited viability of portions of the Company's geographic expansion strategy.

91. The next day, on November 5, 2025, Grocery Outlet released its quarterly report for the fiscal quarter ended September 27, 2025. In the report, the Company stated, amongst other things, that:

> Key financial and operating performance results for the third quarter of fiscal 2025 compared to the third quarter of fiscal 2024 were as follows:
>
> - Net sales increased 5.4% to $1.17 billion from $1.11 billion in the third quarter of fiscal 2024.
>
> . . .
>
> The increases in net sales for the 13 and 39 weeks ended September 27, 2025 were primarily attributable to the addition of 34 net new stores opened over the last 12 months as well as an increase in comparable store sales.
>
> . . .
>
> ***Restructuring Plan.*** We initiated a restructuring plan during the fourth quarter of fiscal 2024, with continued implementation in fiscal 2025, intended to improve long-term profitability, cash flow generation and return on invested capital, optimize the footprint of new store growth and lower our cost base (the "Restructuring Plan"). The Restructuring Plan included (i) the termination of a total of 28 leases for unopened stores in suboptimal locations and the discontinued development of certain future store sites where we had incurred initial costs, but leases had not yet been signed, (ii) the cancellation of certain capital-intensive warehouse projects and (iii) a reduction in headcount in building a more scalable cost structure. As of September 27, 2025, we incurred total costs under the Restructuring Plan of $62 million, of which $38 million were cash expenditures. All costs incurred during the third quarter and first three quarters of fiscal 2025 are included in Restructuring charges on the condensed consolidated statements of

> operations and comprehensive income (loss). The actions under the Restructuring Plan were substantially completed in the second quarter of fiscal 2025.
>
> ***New Store Growth.*** Planned construction and opening of new stores has been, and may continue to be, negatively impacted due to both increased lead times to acquire materials, obtain permits and licenses, hook up utilities as well as higher construction and development related costs. Recently implemented and proposed tariffs could further impact our constructions costs. Our new store growth efforts are focused on organic growth combined with complementary real estate opportunities that align with our long-term geographic expansion and store growth strategies. Complementary growth opportunities may include expanding strategic relationships with large property owners, evaluating acquisitions of opportunistic real estate that become available through consolidation in the retail sector, and exploring strategic regional acquisitions of operating businesses. On April 1, 2024, we acquired The Bargain Barn, Inc., a Tennessee corporation doing business as United Grocery Outlet ("United Grocery Outlet"), which included 40 stores in six adjacent states we did not operate in as of such date (Tennessee, North Carolina, Georgia, Alabama, Kentucky and Virginia) and a company-operated distribution center. The acquisition provides us with the opportunity to scale in a new region and is a platform for potential future expansion in the Southeast. Our near-term integration focus is expanding the assortment, investing in store refreshes and new fixtures and introducing some of our marketing programs to the Southeast region. We opened 35 stores and closed 5 stores in the first three quarters of fiscal 2025 and plan to open 37 net new stores in fiscal 2025.

92. The foregoing statements were materially false and/or misleading, and failed to disclose material adverse facts about Grocery Outlet's business, operations, and prospects. Specifically, the Defendants failed to disclose to investors that: (1) the Company's reported sales growth attributable to stores opened during the preceding 12 months masked the unsustainability of the Company's expansion strategy as it related to store-level profitability; (2) a material number of stores were continuing to underperform despite the Company's repeated assertions that its new-store strategy was improving; (3) the Company's representations concerning its ability to continue expanding into new markets failed to disclose that certain newer markets lacked the experience, personnel, distribution support, and operational infrastructure necessary to achieve sustainable profitability; (4) the Company's plan to open 37 net new stores in fiscal 2025 was belied by the performance of portions of the existing fleet; (5) the Restructuring Plan had not

resolved the underlying deficiencies associated with its expansion strategy; (6) management continued to receive information of underperformance through regular store-performance reports, financial reviews, and other internal monitoring; (7) notwithstanding that information, the Company continued to represent that it possessed substantial opportunities for expansion and that its new-store strategy was producing attractive results; and (8) the Defendants therefore lacked a reasonable basis for their repeated representations concerning sustainable new-store growth, store productivity, geographic expansion, and the effectiveness of the Restructuring Plan.

**The Truth Is Revealed**

93. On March 4, 2026, after the close of trading, Grocery Outlet released its results for the fourth quarter and full fiscal year 2025. On nearly every major financial metric, the Company missed its prior guidance. Adjusted EBITDA totaled $254.3 million—missing guidance of $258 million to $262 million. Net sales totaled $4.69 billion—missing guidance of $4.70 billion to $4.72 billion. Comparable store sales increased by 0.5%—missing guidance of 0.6% to 0.9%. Diluted adjusted earnings per share totaled $0.76—missing guidance of $0.78 to $0.80.

94. Poor metrics were not even the worst of it. As Potter said in his statement, "we have more work to do." Buried in the penultimate line of the paragraph, he announced that the Company would be closing dozens of stores:

> "We made progress on our strategic priorities in 2025; however, our fourth-quarter results made clear that we have more work to do, and we're moving quickly," said Jason Potter, President and CEO of Grocery Outlet. "Consumer pressure intensified, federally funded benefits were delayed, and competition grew more promotional in the fourth quarter. In response, we have begun to sharpen our focus on what matters most: delivering clearer value and a better in-store experience. We're intensely focused on restoring the opportunistic mix to rebuild value perception with the customer and advancing our store refresh program, and we're already seeing early, measurable improvements. At the same time, we're closing underperforming stores, reshaping our new store growth strategy and reallocating resources to strengthen operating results and returns on capital. We are confident that we have identified the core challenges, and now have the right plans in place and the right team to execute them."

95. Indeed, fresh off its Restructuring Plan, Grocery Outlet now announced an "Optimization Plan." According to the release:

> **Optimization Plan and Restructuring Plan:**
>
> To strengthen long-term profitability and cash flow generation, improve operational execution, optimize our existing store footprint and align with our disciplined new store growth strategy, in the first quarter of fiscal 2026 we conducted a strategic, financial and operational analysis of our store fleet. Following that review, on March 2, 2026, our Board of Directors adopted the Optimization Plan that provides for the closure of 36 financially underperforming stores, including the termination or sublease of the applicable store leases, the termination or sublease of a lease for a distribution center facility that we are no longer utilizing, and the termination of operator agreements with independent operators ("IOs") for the applicable store locations as well as certain other store locations. These actions under the Optimization Plan are expected to be substantially completed during fiscal 2026.
>
> In addition, preceding the adoption of the Optimization Plan, during the reporting process for the audited consolidated financial statements for fiscal 2025, we determined that the long-lived assets of the Closure Stores were impaired, and recognized $110 million of non-cash charges in Impairment of long-lived assets . . . . In connection with the Optimization Plan, we currently estimate we will incur between $14 million and $25 million in net total restructuring charges in fiscal 2026 . . . . In addition to the above costs, we estimate that our fiscal 2026 gross profit may be negatively impacted by between $4 million and $6 million as a result of sales discounts or product markdowns to liquidate on-hand inventory during the wind-down of operations of the Closure Stores.
>
> As previously reported, the Company initiated a restructuring plan during the fourth quarter of fiscal 2024, which was substantially completed in the second quarter of fiscal 2025, intended to improve long-term profitability, cash flow generation and return on invested capital, optimize the footprint of new store growth and lower the Company's cost base (the "Restructuring Plan").

96. On an earnings call later that day, Potter termed the Company's results "unacceptable," and revealed that East Coast stores would bear the brunt of the closings:

> Following a rigorous analysis of the fleet, we identified 36 stores in the network that we concluded did not have a viable path to sustained profitability regardless of the operational support we could provide. We've made the difficult decision to close 36 locations, 24 of which are located in the East, representing roughly 30% of that region's fleet.

> We are not fully exiting any state, and we believe we have a meaningful opportunity to grow in the East over the long term. However, it's clear now that we expanded too quickly, and these closures are a direct correction. . . .
>
> And attracting highly skilled people to the business is a very important part of what we're doing. And so we're taking some of the risk by driving that year one sales productivity with the idea that we'll hand that off in a more stable way to our operators post year one. And we think that, that approach might be an interesting thing for us to understand in a place like the East part of the country.

97. In response to a question from an investor, Potter replied:

> Maybe I'll talk about the company has done in the past, which has been successful. So in places like California where we've opened a lot of stores over a long period of time. Operators -- strong operators would typically open new locations. And there is a competency, skill set, and understanding of the business it's very extremely important in a new store.
>
> New stores are generally difficult to run, volumes tend to be lower as your ramping up. And so when we look to places like the east, where we have much fewer stores, the network is relatively new. The experience of the team is obviously at a different place than it is in a place like California.

98. When asked by another investor whether "you remain committed to the [East] region and aren't fully exiting any state," Potter replied:

> We believe that growth will be extendable in those kinds of areas where returns are disappointed in the East in particular. We're, as I mentioned, putting winning conditions in place for that business, including the way we launch we just talked about in Virginia, how we underwrite in select locations is important.
>
> We've modulated already the kind of mix of stores in core markets versus new, and we've done that over the last couple of quarters, which reflects some of the returns that we've indicated. In the East, in particular, the 51 stores that we have remain are all four-wall profitable, and they were comping over 3% in the last quarter.
>
> We think that the DC we just opened in the East, which was opened flawlessly by the team will greatly support the improved product availability that we need for those stores. And the work will continue there, but we're probably going to go in a more measured pace in a place like the East than for sure what's happened over the last five years.

99. Analysts were taken aback by the results. One report from Wells Fargo called them "well below expectations": "The bar was low; this was worse." Investors, it concluded,

should "[w]atch from the sidelines." Another report, from Craig-Hallum, reiterated the sentiment: "Expectations were low heading into GO's Q4 print, but the company disappointed both on Q4 results and with much lower than expected FY26 guidance." The report thus downgraded Grocery Outlet to a hold, and lowered its price target.

100. Yet another report, from Guggenheim, likewise lowered its estimates. "Until the strategic surprises cease," it concluded, "the shares may not re-rate."

101. On this news, Grocery Outlet's stock lost more than a quarter of its value: It fell $2.45, or 27.9%, closing at $6.34 per share on March 5, 2026.

## ADDITIONAL SCIENTER ALLEGATIONS

102. As alleged herein, the Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading when made. The Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. The Defendants, by virtue of their receipt of information reflecting the true facts regarding Grocery Outlet, and their control over and/or receipt and/or modification of Grocery Outlet's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

### A. The Defendants' Admissions Support A Strong Inference Of Scienter

103. The Defendants' own statements during the Class Period, and following the March 2026 disclosure, support a strong inference that they knew, or recklessly disregarded, the true condition of Grocery Outlet's new-store operations.

104. On February 25, 2025, in some of his first public comments upon assuming the mantle of CEO, Potter represented that Grocery Outlet's "near-term challenges related to systems

implementation and new store performance" were "actively being addressed and will be overcome." Potter further represented that he had "spearheaded multiple turnarounds across many grocery models" and understood "what it takes to lead and scale this business," specifically pointing to input from all internal stakeholders: "the team, our independent operators, the Board and our suppliers." On the same call, Lindberg—who had just ceded the role of CEO to Potter—confirmed that "we have been evaluating our recent store openings."

105. A year later, however, on March 4, 2026, Potter admitted that Grocery Outlet had "expanded too quickly" and characterized the closure of 36 stores as "a direct correction." This, he said, came "[f]ollowing a rigorous analysis of the fleet." He further explained that the East Coast stores presented particular difficulties because the Company's network there was "relatively new" and its team lacked the experience and understanding possessed by the Company's California operations.

106. These later admissions are particularly probative because the facts he identified as causing the Company's problems—rapid expansion, inadequate experience in newer markets, and the need for a more measured expansion strategy—were precisely the subjects about which he and the Company repeatedly reassured investors during the Class Period. Furthermore, the reason he gave for *identifying* these problems—"a rigorous analysis of the fleet"—is precisely what Lindberg admitted the Company undertook a full year earlier, by "evaluating our recent store openings."

107. Potter's March 2026 statements, furthermore, demonstrate that Grocery Outlet's problems were not merely unforeseeable consequences of changing market conditions. Rather, Potter directly pegged the problems to the unprofitability of stores; he called this a "direct correction" to over-expansion, and due to a lack of understanding of East Coast dynamics.

108. These statements support a strong inference that the condition of the Company's stores, the viability of its newer markets, and the consequences of its prior expansion were matters of which the Defendants were acutely aware, including at the time of their prior statements.

**B. That The Defendants Held Themselves Out As Particularly Knowledgeable And Well Versed In Turnaround Scenarios Shows They Closely Monitored And Tracked Store Performance**

109. Furthermore, the Individual Defendants were brought in during a time of enhanced concern for the Company: At the beginning of the Restructuring Plan, at the helm of which they would stand.

110. Indeed, Potter introduced himself to investors in February 2025 as a CEO who had "spearheaded multiple turnarounds across many grocery models," and averred that Grocery Outlet's challenges were "familiar territory." In prior such cases, he said, "we were successful in driving sales, profitability and ultimately returns for all stakeholders." Miller was likewise brought on as CFO at this time, and throughout the Class Period was responsible for informing investors of Grocery Outlet's financial results, guidance, restructuring costs, and store growth.

111. The Individual Defendants therefore held themselves out to investors as possessing particular expertise in identifying operational deficiencies, correcting underperforming businesses, and determining the appropriate pace of growth.

112. These representations are significant, because the problems concealed from investors were not peripheral matters outside the Defendants' purported areas of expertise. Rather, the alleged problems concerned store-level sales, profitability, new-store performance, expansion strategy, and the viability of particular geographic markets—all matters that senior executive and financial leadership would be expected to monitor closely. And, in an already stressed environment, their attention to these matters would be expected to be even greater.

113. Indeed, the Company repeatedly represented that it was "rebalancing store growth towards a healthy mix of core versus new markets, adjusting our internal returns framework, developing more robust site selection criteria, and testing several key commercial pilots to drive our performance." The Individual Defendants cannot reasonably be viewed as remote observers of the conditions underlying the statements alleged herein. Their positions, responsibilities, representations regarding their expertise, and direct participation in the Company's disclosures support a strong inference that they knew, or recklessly disregarded, the adverse information concerning new-store performance and the Company's expansion strategy.

**C. Defendants' Involvement In The Reorganization Plan And The Optimization Plan Supports Scienter**

114. The Defendants' direct involvement in the Restructuring Plan and the subsequent Optimization Plan further supports scienter. The Restructuring Plan was not an ordinary-course business development: It was undertaken following an "evaluati[on of] recent store openings," and expressly because Grocery Outlet had determined that it needed to alter its growth strategy, terminate leases for unopened stores in "suboptimal locations," cancel warehouse projects, reduce its workforce, and narrow its focus to existing and high-priority adjacent markets. The Company repeatedly represented that these measures would improve profitability, cash-flow generation, return on invested capital, and new-store productivity. The Individual Defendants, as CEO and CFO, were directly involved in implementing and coordinating the Restructuring Plan, and communicating its objectives, its costs, and its purported progress to investors.

115. Yet the restructuring also eliminated personnel and functions that were directly responsible for supporting new stores and their operators—such as the New Store Set Team, the New Store Support Team, and the New Store Transition Coach. These actions concerned the very operational infrastructure that management claimed was necessary to improve new-store performance and generate sustainable returns. At the same time, Company personnel continued

to receive information concerning poor store performance through monthly reports, store-performance meetings, financial reviews, and TCAP-related monitoring.

116. The subsequent Optimization Plan further demonstrates the significance of the information available to the Defendants. After repeatedly representing that the Restructuring Plan had been substantially completed and that the Company was improving new-store performance, Grocery Outlet suddenly announced that another plan was in order. The Company recognized $110 million in non-cash impairment charges relating to 36 unprofitable stores and announced their closure.

117. Potter expressly characterized the closures as a "direct correction" for the Company's prior overexpansion. The close connection between the matters addressed by the Restructuring Plan and the matters ultimately addressed by the Optimization Plan supports the inference that the Defendants had access to information concerning the underlying operational deficiencies throughout the Class Period and, at minimum, recklessly disregarded the significance of that information when making positive statements about the Company's growth and store performance.

### D. Senior Leadership Regularly Discussed Information In Meetings And Regular Reports That Was Readily Accessible To The Individual Defendants

118. Scienter is further supported by the regularity and specificity of the information concerning store performance that was distributed within Grocery Outlet and to its senior leadership.

119. According to CW3, Grocery Outlet generated monthly store-performance reports containing detailed financial information, and stores reporting low numbers or substantial swings in sales were expected to explain their performance during Zoom meetings involving Company leadership. Grocery Outlet also conducted separate monthly financial reviews involving store

operators, a C-level accountant, and regional representatives, after which corporate personnel compiled the information for senior executives, including the CFO.

120. In addition, stores participating in the Company's TCAP program—which, by definition, were stores that were not yet self-sufficient—were subject to heightened reviews of customer accounts and detailed operating metrics, including basket size and purchasing patterns. Such stores also participated in additional monthly calls focused on store performance.

121. Furthermore, the statements by CW2 independently corroborate the existence of recurring management discussions concerning store performance. Indeed, the performance of individual stores was discussed on regular calls with leadership including the CIO. According to CW2, however, only a small number of stores were performing well, while the majority were underperforming; the meetings repeatedly highlighted the disparity between those stores. CW2 further recalled that it was known within the Company that certain locations were simply unable to sustain operations, and CW3 likewise reported that knowledge concerning prospective store closures circulated within the Company before the affected operators were informed.

122. These allegations establish that the condition of the Company's store fleet was the subject of recurring internal analysis and discussion, rather than information that emerged suddenly in March 2026.

123. The information described by CW2 and CW3 was directly relevant to the representations the Defendants made concerning new-store performance, geographic expansion, site selection, and the effectiveness of the Restructuring Plan. The Defendants nevertheless repeatedly represented that Grocery Outlet was improving execution, that its new-store cohort was performing ahead of plan, that its growth strategy remained sound, and that it continued to possess substantial opportunities for expansion.

124. Given the regular flow of store-level financial and operational information to senior management, including the CFO and CIO, the Defendants knew, or were deliberately reckless in failing to know, that these representations omitted material information concerning the Company's underperforming stores and the viability of its expansion strategy.

**E. <u>Corporate Scienter</u>**

125. The allegations above also establish a strong inference that Grocery Outlet acted with corporate scienter throughout the Class Period, as its officers, management, and agents, including, but not limited to, the Individual Defendants, had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.

126. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Grocery Outlet under *respondeat superior* and agency principles.

## LOSS CAUSATION

127. During the Class Period, as detailed herein, the Defendants materially misled the investing public, thereby inflating the price of Grocery Outlet's securities and/or maintaining the artificial inflation in Grocery Outlet's securities, by publicly issuing materially false and/or misleading statements and omitting to disclose material facts necessary to make those statements, as set forth herein, not materially false or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose materially adverse information and/or misrepresented the truth about the Company's business, operations, and prospects as alleged herein.

128. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, the Defendants made or caused to be made a series of materially false or misleading statements concerning the Company's business prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.

129. The Defendants' statements were materially and objectively misleading when made, as set forth above, and had the cause and effect of creating in the market an unrealistically positive assessment of the Company's business, operations, financial condition, growth strategy, and prospects, thus causing Grocery Outlet's securities to be overvalued and artificially inflated at all relevant times. The materially false or misleading statements made or endorsed by the Defendants during the Class Period resulted in Plaintiff and other members of the Class purchasing Grocery Outlet's stock at artificially inflated prices, thus causing the damages complained of herein.

130. Beginning after market close on March 4, 2026, the Defendants issued corrective disclosures in the form of a press release, and earnings call, announcing their results for the fourth quarter and full fiscal year 2025. This set of corrective disclosures revealed the Defendants' misstatements as set forth above.

131. Analysts were surprised by the Defendants' disclosures and reacted negatively. For instance, a report from Wells Fargo called the results "well below expectations": "The bar was low; this was worse." It concluded that investors should "Watch from the sidelines." Another report, from Craig-Hallum, stated that "[e]xpectations were low heading into GO's Q4 print, but

the company disappointed both on Q4 results and with much lower than expected FY26 guidance." The report downgraded Grocery Outlet to a hold, and lowered its stock target. A further report, from Guggenheim, likewise lowered its estimates. "Until the strategic surprises cease," it concluded, "the shares may not re-rate."

132. When markets opened the following day, Grocery Outlet's stock lost more than a quarter of its value: It fell $2.45, or 27.9%, closing at $6.34 per share on March 5, 2026.

133. As a result of their purchases of Grocery Outlet's securities during the Class Period at artificially inflated prices, Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws. The timing and magnitude of the price declines in Grocery Outlet's securities, the statements in the Company's corrective disclosures, and the market's reaction negate any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or facts specific to the Company that were unrelated to the Defendants' fraudulent conduct.

## PLAINTIFF'S CLASS-ACTION ALLEGATIONS

134. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Grocery Outlet securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are the Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which the Defendants have or had a controlling interest.

135. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Grocery Outlet securities were actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiff at this time and

can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Grocery Outlet or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

136. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendants' wrongful conduct in violation of federal law that is complained of herein.

137. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

138. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Amongst the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by the Defendants' acts as alleged herein;
- whether statements made by the Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Grocery Outlet;
- whether the Individual Defendants caused Grocery Outlet to issue false and misleading financial statements during the Class Period;
- whether the Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Grocery Outlet securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

139. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

140. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- The Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Grocery Outlet securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the Nasdaq and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased, acquired and/or sold Grocery Outlet securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

141. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

142. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as the Defendants omitted material

information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## PRESUMPTION OF RELIANCE

143. Plaintiff is presumed to have relied on the Defendants' misrepresentations and omissions under the fraud-on-the-market doctrine. At all times, the market for Grocery Outlet securities was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's common stock. Throughout the Class Period:

- Grocery Outlet's securities were actively traded on the Nasdaq;
- The market price of Grocery Outlet securities reacted promptly to the dissemination of public information regarding the Company;
- Grocery Outlet's stock was followed by many financial analysts, including those cited in this Complaint;
- The average weekly trading volume for Grocery Outlet stock during the Class Period was approximately 14 million shares;
- As a regulated issuer, Grocery Outlet filed with the SEC periodic public reports during the Class Period;
- Grocery Outlet regularly communicated with public investors via established market communication mechanisms; and
- During the Class Period, Grocery Outlet had over 98 million shares in the public float and the Company's market capitalization ranged between approximately $0.62 and $1.28 billion.

144. Throughout the Class Period, Grocery Outlet was consistently followed by the market, including securities analysts and the media. The market relies upon Grocery Outlet's financial results and management to accurately present the Company's financial results. During the Class Period, the Defendants continued to pump materially false and misleading information into the marketplace regarding Grocery Outlet. This information was promptly reviewed and

analyzed by analysts and institutional investors and assimilated into the price of Grocery Outlet's securities.

145. As a result of the misconduct alleged herein, including the Defendants' false and misleading statements and omissions, the market for Grocery Outlet securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which the Defendants are responsible.

146. Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Grocery Outlet securities at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

147. Plaintiff and the other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because claims asserted in this Complaint against the Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

148. Had Plaintiff and other members of the Class known of the material adverse information not disclosed by the Defendants or otherwise been aware of the truth behind the Defendants' material misstatements, they would not have purchased Grocery Outlet securities at artificially inflated prices.

## NO STATUTORY SAFE HARBOR

149. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

150. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when

made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

151. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, the Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Grocery Outlet who knew that the statement was false when made

**COUNT I**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

152. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

153. This Count is asserted against the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

154. During the Class Period, the Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Grocery Outlet securities; and (iii) cause Plaintiff and other members of the Class

to purchase or otherwise acquire Grocery Outlet securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Defendants, and each of them, took the actions set forth herein.

155. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Grocery Outlet securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Grocery Outlet's finances and business prospects.

156. By virtue of their positions at Grocery Outlet, the Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, the Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Defendants. Said acts and omissions of the Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

157. Information showing that the Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Defendants' knowledge and control. As the senior managers and/or directors of Grocery Outlet, the Individual Defendants had knowledge of the details of Grocery Outlet's internal affairs.

158. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Grocery Outlet. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Grocery Outlet's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Grocery Outlet securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Grocery Outlet's business and financial condition which were concealed by the Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Grocery Outlet securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Defendants, and were damaged thereby.

159. During the Class Period, Grocery Outlet securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Grocery Outlet securities at prices artificially inflated by the Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Grocery Outlet securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Grocery Outlet

securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

160. By reason of the conduct alleged herein, the Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

161. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had disseminated false and misleading statements to the investing public.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

162. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

163. During the Class Period, the Individual Defendants participated in the operation and management of Grocery Outlet, and conducted and participated, directly and indirectly, in the conduct of Grocery Outlet's business affairs. Because of their senior positions, they knew the adverse non-public information about Grocery Outlet's misstatements.

164. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Grocery Outlet's financial condition and results of operations, and to correct promptly any public statements issued by Grocery Outlet which had become materially false or misleading.

165. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and

public filings which Grocery Outlet disseminated in the marketplace during the Class Period concerning Grocery Outlet's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Grocery Outlet to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Grocery Outlet within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Grocery Outlet securities.

166. Each of the Individual Defendants, therefore, acted as a controlling person of Grocery Outlet. By reason of their senior management positions and/or being directors of Grocery Outlet, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Grocery Outlet to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Grocery Outlet and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

167. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Grocery Outlet.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against the Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring the Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: September 4, 2026

Respectfully submitted,

POMERANTZ LLP

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
T: (310) 405-7190
jpafiti@pomlaw.com

Luc W. M. Mitchell (SBN 355909)
600 Third Avenue, 20th Floor
New York, New York 10016
T: (212) 661-1100
lmitchell@pomlaw.com

LEVI & KORSINSKY, LLP
Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
T: (415) 373-1671
aapton@zlk.com

*Attorneys for Plaintiff*